**METHODIST HOSPITALS OF DALLAS, et al., Appellants,**

v.

**TEXAS INDUSTRIAL ACCIDENT BOARD, et al., Appellees.**

No. 3–90–052–CV.

Court of Appeals of Texas, Austin.

Nov. 28, 1990.

Rehearing Overruled Jan. 9, 1991.

Peter Clarke, James B. Harris, Thompson & Knight, Dallas, for appellants.

Jim Mattox, Atty. Gen., George Warner, Asst. Atty. Gen., Dudley D. McCalla, Heath, Davis & McCalla, P.C., Charles M. Babb, Charles M. Babb, P.C., Austin, for appellees.

Before POWERS, GAMMAGE and CARROLL, JJ.

POWERS, Justice.

Methodist Hospitals of Dallas, together with numerous other hospitals, sued the Industrial Accident Board[1] to restrain by temporary and permanent injunctions the enforcement of a Board rule alleged to be invalid.[2] The hospitals appeal from the trial court's interlocutory order denying their application for temporary injunction. Tex.Civ.Prac. & Rem.Code Ann. § 51.014(4) (Supp.1990). We will affirm the trial-court order.

## THE CONTROVERSY

In 1987, the Legislature directed the Board to establish and maintain "a guideline of fair and reasonable fees and charges" that hospitals may collect for their treatment of workers-compensation patients. Tex.Rev.Civ.Stat.Ann. art. 8306, § 7b(c)(1) (Supp.1990) (to be repealed January 1, 1991). In response, the Board adopted its Rule 42.110. 28 Tex.Admin. Code § 42.110 (Supp.1990).

The present litigation centers around two limitations that Rule 42.110 imposes upon a hospital's fees and charges. After requiring that each hospital state on a "chargemaster" the price of each service and article for which it charges its patients, the rule requires that the stated prices be discounted for workers-compensation patients at a rate calculable under the rule.[3] Next, the Rule forbids a hospital to increase its "chargemaster" prices except within a "Maximum Allowable Rate of Increase" (MARI) fixed by the Board. For the year 1990, the Board has fixed the MARI at seven percent. While the hospitals aver that the two limitations—the required discount and the MARI—do not permit the hospitals to recover their costs in caring for workers-compensation patients, the hospitals do not challenge the validity of Rule 42.110 except on the statutory ground that the Rule is the product of unlawful procedure.[4]

The hospitals refer to § 5 of the Texas Administrative Procedure and Texas Reg-

1. The Board is now the Texas Workers' Compensation Commission, see 1989 Tex.Sess.Law. Serv., 2nd C.S., ch. 1 § 17.01, at 115; § 17.18(b), at 122.

2. The appellants are: Methodist Hospitals of Dallas; All Saints Episcopal Hospitals of Fort Worth; Arlington Memorial Hospital Foundation, Incorporated; Baylor University Medical Center (Dallas); Dallas County Hospital District; Doctors Hospital of Dallas; Fort Worth Osteopathic Hospital Incorporated, doing business under the name Fort Worth Osteopathic Medical Center; Harris Methodist Hospital—Fort Worth; Harris Methodist Hospital–HEB; Irving Healthcare System; Mother Francis Hospital of Tyler, Texas; RHD Memorial Medical Center; Richardson Hospital Authority doing business under the name Richardson Medical Center; Southside Hospital; St. Luke's Episcopal Hospital; St. Luke's Lutheran Hospital; St. Paul Medical Center; Texoma Medical Center, Inc., doing business under the name Texoma Medical Center; The Good Shepherd Hospital, Inc., doing business under the name Good Shepherd Medical Center; Trinity Medical Center; and Valley Baptist Medical Center.

The appellees are the Industrial Accident Board and Richard Fulcher.

3. A percentage is determined which represents the ratio of "total operating expenses" to "adjusted net revenue" in the preceding year. The difference between that ratio and 100 percent is the amount of the discount that a hospital must deduct from its "chargemaster" prices in cases of workers-compensation patients.

"Total operating expenses" are defined in the Rule as "the sum of health facility operating expenses, as recorded on an accrual basis, including, but not limited to, salaries and wages; employee benefits; professional fees; supplies; depreciation; amortization; interest; state and local taxes paid, excluding any income tax; and administrative and facility overhead expenses." "Adjusted net revenues" are defined in the Rule as "Total patient revenues plus other operating revenues, minus deductions for uncompensated care, Medicare contractual allowances, Medicaid contractual allowances, and other governmental contractual allowances."

4. The present version of Rule 42.110 is not the first version of that Rule adopted by the Board. An earlier version was to become effective September 1, 1988, but its enforcement was restrained as a result of an earlier lawsuit. The Board then adopted a second version of Rule

ister Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Supp.1990). Section 5 establishes procedures the Board was bound to observe in adopting Rule 42.110, and § 5(e) declares that no agency rule is valid unless adopted in "substantial compliance" with those procedures.

The hospitals allege that Rule 42.110 was not adopted in substantial compliance with § 5 for two reasons: (1) the Board did not include in its notice initiating the rule-making proceeding a sufficient "public benefit-cost note," as required by § 5(a)(5); and (2) the Board did not include in its order finally adopting Rule 42.110 a sufficient statement of the Board's "reasoned justification" for the rule, as required by § 5(c–1)(1).

### THE MEANING OF "SUBSTANTIAL COMPLIANCE"

Before discussing the hospitals' assignments of error, we should state our view as to the meaning of "substantial compliance" as that expression is used in APTRA § 5(e) to measure the validity of an agency rule.

It is customary to say, of course, that "substantial compliance" does not mean literal and exact compliance with every requirement of a statute, but simply "compliance" with the "essential" requirements of the statute. *Santos v. Guerra*, 570 S.W.2d 437, 440 (Tex.Civ.App.1978, writ ref'd n.r. e.); *Wentworth v. Medellin*, 529 S.W.2d 125, 128 (Tex.Civ.App.1975, no writ); *Fitzgibbons v. Galveston Electric Co.*, 136 S.W. 1186, 1187 (Tex.Civ.App.1911, no writ). This begs the question, however, because it leaves undefined the controlling factors: What statutory requirements are

42.110, which was held void in the same suit on June 22, 1989.

On July 21, 1989, however, the Board had initiated a new rule-making proceeding that proposed adoption of the present version of Rule 42.110. After the requisite period for public comment, prescribed in APTRA § 5(c), the Board finally adopted the proposed rule by an order dated November 7, 1989. The present controversy deals with this latest version of the Rule.

5. As originally enacted in 1975, APTRA § 5(a) listed several items that the agency must include

"essential" and what constitutes "compliance" with them?

■ We shall employ hereafter what we believe is a better sense of the expression "substantial compliance." We think the question of "substantial compliance" with a statutory requirement has two parts: Do the acts tendered in satisfaction of a statutory requirement (1) secure the legislative objectives that underlie the requirement and (2) come fairly within the character and scope of each action or thing explicitly required by the statute in terms that are concise, specific, and unambiguous? *See* Beal, *The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of Legislating and Rulemaking in Texas,* 39 Baylor L.Rev. 597, 646–47 (1987). While not perfect, perhaps, we believe this formulation to be superior to the more opaque usage mentioned previously.

The foregoing indicates the great importance of the legislative objectives that underlie any statutory requirement when a party claims that the actions taken thereunder fall short of "substantial compliance." In the discussion that follows, we must therefore set out our views concerning what those objectives were in the Legislature's enactment of APTRA § 5(a)(5) and § 5(c–1)(1).

### THE "PUBLIC BENEFIT–COST NOTE"

■ Where APTRA governs an agency's rule-making procedures, § 5(a) requires that the agency file with the secretary of state a "notice" of the proposed rule, for publication by that officer in the Texas Register.[5] The notice must include certain items as specified in § 5(a). Section 5(a)(5) describes one such item as follows:

in its notice of a proposed rule, including a brief explanation of the rule, the text of the rule, a statement of the authority under which the rule will be promulgated, a request for comments from any interested person, and any other statement required by law. 1975 Tex.Gen.Laws, ch. 61, § 5 at 138 [Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 5(a), since amended]. The 67th Legislature added § 5(a)(5) effective September 1, 1981, 1981 Tex.Gen.Laws, ch. 816, § 1 at 3094 [Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 5(a)(5) ].

a public benefit-cost note showing the name and title of the officer or employee responsible for preparing or approving it and stating for each year for the first five years that the rule will be in effect: (A) the public benefits to be expected as a result of adoption of the proposed rule; and (B) the probable economic cost to persons who are required to comply with the rule.

Section 5(a)(5) results from a 1981 amendment to APTRA; a "public benefit-cost note" was not theretofore required to be included in the notice. The basic logic of the required comparison should be indisputable. An assessment of the public benefits and probable cost of compliance associated with a proposed rule, and a comparison between them, is simply rational administration.[6]

Before the 1981 amendment, an agency might have voluntarily made the assessments and comparison but in a superficial, vague, or intuitive way, as it concentrated on the necessity for a proposed rule, its objectives, the text necessary to achieve those objectives, and the procedures that must be followed in adopting a rule under APTRA § 5. The central objective behind the 1981 amendment was to force the agency to engage in a *conscious* assessment and comparison of the expected public benefits and economic cost of compliance *before* the agency finally arrives at the text of a proposed rule to be included in the notice filed with the secretary of state, utilizing the agency's own expertise, information, and facilities, which would ordinarily be superior and result in the best assessments and comparison.

Several collateral objectives suggest themselves as well. The required public benefit-cost note alerts affected persons of the likely effects of the proposed rule, and

encourages meaningful participation in the public-comment period contemplated in § 5(c). The agency is able intelligently to make the best trade-off between competing affected interests and to save the cost of wasted effort and expenditures associated with contemplated rules that are determined subsequently to be impractical in light of the assessments and comparison. The public has more confidence in agency rules, knowing the assessments and comparison have been made. The agency is kept within the bounds and purposes of any controlling statutes, as in the present case where the statutory directive that the Board establish guidelines for "fair and reasonable" fees and charges requires, rather plainly, the assessments and comparison. And a reviewing court is informed of an important consideration in the court's construction of the rule after its adoption, should that be necessary. *See generally* O'Reilly, Administrative Rule-making § 9.05, at 184–87 (1983).

With the foregoing legislative objectives in mind, we turn to the hospitals' complaint that the Board's notice, initiating the proceeding that led to the adoption of Rule 42.110, was not in substantial compliance with APTRA § 5(a)(5).

The notice described the public benefits as follows:

For each year of the first five years ... the public benefit anticipated ... will be provision of a uniform standard for fair and reasonable fees and charges for health facility goods and services that should result in: (1) improved delivery and quality of health facility goods and services to claimants; and (2) reduced premiums for employers.... [7]

The notice described the probable economic cost of compliance as follows:

---

**6.** A cost-benefit analysis is a decision-making function much more sophisticated than a mere comparison of direct costs and concrete benefits. *See generally* Koch, Administrative Law and Practice §§ 4.33–.34, at 241–51 (1985).

**7.** The notice described certain advantages expected to accrue to workers-compensation insurance carriers under the proposed rule; and in the Board's brief on appeal, it includes these advantages as part of the "public benefits" ele-

ment of the public benefit-cost note required by APTRA § 5(a)(5). We decline to follow suit. The notice itself does not imply that these advantages were "public benefits" *in the Board's view* at the time the notice was filed, and nothing else in the notice gives rise to such an implication. Rather, the notice refers to the "public benefits" as being those quoted in the text.

[P]ublic health facilities should experience impact on revenue resulting from the combined effects of the following factors: (1) a maximum allowable rate of increase (MARI) in total charges for compensable health care, established annually by the board (7.0% for the first year the proposed section will be in effect); (2) carrier application of a facility's unique payment ratio, ranging from .85 to 1.00, to the facility's billed charges to determine a fair and reasonable payment for compensable health care; (3) administrative costs incurred in preparing and filing the required ratio report and monitoring compliance with the MARI....

The hospitals contend the foregoing statements fail for two reasons to supply the substance of the public benefit-cost note required by § 5(a)(5): (1) the statements omit to assign any monetary amount to the expected public benefits and the economic costs of compliance; and (2) the statements consist of bare and quite general conclusions unsupported by any statements demonstrating that the Board actually made an assessment of public benefits and the costs of compliance, and a comparison between them—for example, nothing in the statements demonstrates how the Board reasoned to its naked conclusions that the proposed rule will result in reduced insurance premiums and improved health care. The Board opposes these arguments on two grounds: (1) nothing in § 5(a)(5) explicitly requires that monetary amounts be assigned the expected public benefits and economic costs of compliance; and (2) all the statute requires is "fair notice," which was imparted by the statements quoted above.

■ We believe the Legislature could not have intended by the 1981 amendment that an agency must in every case assign a monetary amount to the expected public benefits and costs of compliance. This is not possible in every area in which Texas administrative agencies are expected or required to use their rule-making power; a universal or absolute requirement of that kind would be unreasonable. *See Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 387 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

■ Considering the text of § 5(a)(5), its necessary implications, and its underlying objectives, we cannot conclude that the Board's notice in the present case failed of substantial compliance with the statute.[8] The text of the proposed rule was also included in the notice, along with the paragraphs (quoted above) describing the expected public benefits and probable costs of compliance. We believe the sufficiency of these paragraphs must be judged not in isolation but in light of the substance and text of the proposed rule to which the paragraphs referred.

### Economic Cost of Compliance

The text of the proposed rule indicated the wide variety of hospitals required to comply with the Rule, and the difficulty of estimating the probable economic costs of compliance for all or each of them in light of their peculiar individual modes of operation. This implies necessarily that it would be impractical to attempt greater detail in the matter of the probable economic cost of compliance, beyond what was stated in the notice: a description of the particular *kinds* or *classes* of expected costs; the limitation imposed by the MARI and by any particular hospital's "unique payment ratio"; and the administrative costs associated with filing the ratio report and monitoring compliance with the MARI limitation. This reasoning is self-evident under the Rule. It has not been suggested to us that the statements in the notice fail for some reason to meet any objectives underlying § 5(a)(5), except for the matter of "fair notice." We conclude, however, that the Board's statement satisfied even this collateral objective.

---

**8.** As indicated in the text, we concur with Professor Beal that the public benefit-cost note requirement of APTRA § 5(a)(5) implies a *general* statement of the expected costs and benefits. Beal, *supra*, at 660.

*Public Benefits*

The Board's statement in the notice, relative to the public benefits to be expected from the proposed rule, is also aided by reference to the accompanying text of the proposed rule. The notice states basically that the proposed rule would lead to a "uniform standard for fair and reasonable fees and charges," and these should result in improved health care and reduced premiums for workers-compensation insurance paid by employers. The "uniform standard" is implicit in the text of the proposed rule set out in the notice—that is what the rule purports to establish and require—and the self-evident effects of the mandatory discount and the MARI are to reduce and control increases in the sums charged workers-compensation patients, with a resulting reduction in premiums paid by employers. The hospitals are correct, however, in their contention that nothing in the notice demonstrates any rationale behind the Board's naked and general conclusion that the "uniform standard" and reduced prices required by the proposed rule will result in *better* health care. We believe, however, that this single omission does not require that we invalidate Rule 42.110 for want of substantial compliance. Nothing in APTRA § 5(a)(5) explicitly requires such a stated rationale, and we cannot see how the single omission affects adversely any objective underlying § 5(a)(5).

## THE "REASONED JUSTIFICATION" FOR THE PROPOSED RULE

■ In complaining of a want of substantial compliance with the rule-making procedures of APTRA § 5, the hospitals also complain that the Board omitted to include in its order adopting Rule 42.110 a sufficient "reasoned justification" for the Rule, as required by § 5(c-1)(1).

Section 5(c-1)(1) requires that an agency set out a "reasoned justification" in any order finally adopting a proposed rule after the public-comment period; and, the "reasoned justification" *must include* three substantive elements: (1) "a summary of comments received from parties interested in the rule," with their names and "whether they were for or against its adoption"; (2) "a restatement of the rule's factual bases"; and (3) "the reasons why the agency disagrees with party submissions and proposals." [9]

---

**9.** The Legislature added § 5(c-1)(1) to APTRA in 1981. 1981 Tex.Gen.Laws, ch. 816, § 1, at 3094. The new subsection resulted in a partial duplication of a similar requirement found in § 5(c). Section 5(c) requires that an agency afford reasonable opportunity for interested persons to submit data, views, or arguments about the proposed rule, which the agency must consider fully; and

> *On adoption of a rule,* the agency, *if requested to do so* by an interested person either prior to adoption or within 30 days after adoption, shall issue a concise statement of the *principal reasons for and against its adoption,* incorporating in the statement *its reasons for overruling the considerations urged against its adoption.*

(Emphasis added). The foregoing part of APTRA § 5(c) was taken almost verbatim from the 1961 Model State Administrative Procedure Act § 3(a)(2). The commissioners' comment accompanying that section declares the purpose behind requiring the agency to supply, on request, the information indicated in the above quotation: "to give some degree of assurance that the agency will, *in fact,* consider the arguments advanced by the affected parties." (Emphasis added).

In drafting the 1981 Model State Administrative Procedure Act, the commissioners supplanted the previous requirement that the agency supply the specified information *when requested* to do so by an "interested person" following adoption of a rule. Section 3-110 of the 1981 Model Act provides:

> (a) At the time it adopts a rule, an agency shall issue a concise explanatory statement containing:
>
> (1) its reasons for adopting the rule; and
>
> (2) an indication of any change between the text of the proposed rule contained in the published notice of proposed rule adoption and the text of the rule as finally adopted, with the reasons for any change.
>
> * * * * *

In the accompanying comment, the commissioners stated their reasons for imposing a mandatory requirement in lieu of a requirement that had been "operative *only on demand by an* 'interested person'":

> In requiring a statement of reasons, paragraph (1) forces an agency to clearly articulate all of its factual, legal, and policy reasons for adopting the rule.... [Paragraph (2)] assures an explanation for any changes made by the agency in the proposed rule when it is finally adopted.

The change was thought desirable because it imposed no significant burden upon the agency,

The hospitals argue that the agency order omits to restate any *factual bases* for the Rule and omits to give any of the Board's *reasons* for disagreeing with party submissions and proposals made during the public-comment period, two of the three substantive elements that must be included in the "reasoned justification" required by § 5(c–1)(1).

By way of reply, the Board recasts the hospitals' argument then refutes it easily by reference to parts of the order. For example, the hospitals complain that the Board omitted to state its *reasons* for disagreeing with party submissions and proposals made during the public-comment period, but the Board characterizes this as a complaint that the Board failed to "consider" and failed to "respond" to party submissions and proposals. This the Board easily refutes by pointing to those parts of the order in which it expressly adopted three proposals submitted to the Board and

in which the Board expressly referred to the comments of at least one party (Methodist Hospitals of Dallas) regarding the MARI and the permissive substitution of "Blue Cross/Blue Shield" fees and charges for those dictated by the discount formula prescribed in the Rule.

The Board expressly declines in its brief to make any further reply to the hospitals' attempt to "fly speck" or "nit pick" its order finally adopting Rule 42.110, beyond pointing out that the hospitals suffered no harm, by reason of any want of substantial compliance with § 5(c–1)(1), because they appeared at two public hearings on the proposed rule, they submitted comments in the public-comment period, and they were free to introduce at the temporary-injunction hearing "any and all evidence desired ... in their effort to invalidate the rule."

We find in the Board's brief nothing that amounts to an explicit reply to the hospitals' argument that the Board's order final-

---

which had presumably developed the required information internally in response to its statutory duty to consider fully all comments received by it; and the requirement would, it was believed, lead to better rules. *See* Bonfield, State Administrative Rule Making § 6.10.1, at 308–15 (1986).

In adding § 5(c–1)(1), the Legislature borrowed from § 3–110 of the 1981 Model Act the idea of requiring explanatory statements in *every* instance in which an agency adopts a rule, whether such statements were requested by interested persons or not, and borrowed as well the central ideas if not the same phrasing found in § 3–110. Section 5(c–1)(1) requires a "reasoned justification" in each instance in which the agency adopts a rule, which must contain a summary of the comments received, the names of those who made them, a statement of the factual bases for the rule, and a statement of the agency's "reasons" for disagreeing "with party submissions and proposals." The Legislature did not, however, repeal APTRA § 5(c), which made such agency explanations depend upon a request by an interested person.

Hence, § 5(c) and § 5(c–1)(1) duplicate to some extent what is required of an agency when it adopts a rule. The two are sufficiently different, however, that we may not consider that the latter repealed the former by implication, an implication a court should always hesitate to make; and we must presume both statutes were intended to be meaningful and effective, harmonizing them where necessary to give them that character and effect. *Black v. American Bankers Ins. Co.*, 478 S.W.2d 434, 437 (Tex. 1972).

For the reasons given in the text, we need not in the present case harmonize any conflicts resulting from the overlap between § 5(c) and § 5(c–1)(1). We may say, however, that it appears that the universal requirement imposed by § 5(c–1)(1) would permit a summary treatment of the four items mentioned therein, while § 5(c) would require a more specific or detailed statement of reasons for and against adoption, and for overruling the considerations urged against adoption of a rule. It would make little sense for the agency to issue a detailed, specific statement in each and every order adopting a rule, and then issue the same kind of statement on request by an interested person.

Moreover, it appears reasonable to conclude that the Legislature, by leaving the two statutes in concurrent effect, must have believed that the more onerous requirement should be that imposed only in selected cases, as opposed to the burden that would be imposed on the agencies should they have to make the detailed, specific statement in every instance. Most agency rules are not controversial; they may be substantive or procedural and more or less comprehensive; they may intrude seriously upon private interests or be negligible in that regard. Should the more onerous requirement be imposed in every case, the burden imposed on rule making would not be insignificant. These considerations may arise in a future case involving the *sufficiency* of statements under § 5(c–1)(1). They do not apply in the present case, for the Board here omitted entirely two of the three substantive items which § 5(c–1)(1) required in language that is concise, specific, and unambiguous.

ly adopting Rule 42.110 omitted to include "a restatement of the rule's *factual bases*" and "the *reasons* why the [Board] disagrees with party submissions and proposals." Moreover, the Board's theory of harmless error is quite untenable for the reasons given below.

■ In considering the hospitals' contentions regarding § 5(c–1)(1) and the Board's order in the present case, we should say first that we believe the question of substantial compliance with that statute is a question of law to be determined solely from the face of the Board order finally adopting Rule 42.110. So much is necessarily implied by the statute itself. Substantial compliance is not a question of fact, to be determined by evidence adduced subsequently in a reviewing court, concerning *whether* the agency had *unstated* factual bases for its rule or *unstated* reasons for disagreeing with party submissions and proposals, and *what these were in fact*, or whether any *stated* factual bases or reasons for disagreeing were *in fact* considered and accepted by the agency on *sufficient evidence*. In this respect, we disagree with the position of the hospitals and the Board to the extent each refers in its brief to the evidence that was introduced in the hearing on the hospitals' application for temporary injunction. We therefore review the hospitals' point of error solely on the basis of what the order states *on its face*, compared to what § 5(c–1)(1) requires.

As mentioned above, § 5(c–1)(1) requires that the Board state in its order finally adopting Rule 42.110 a "reasoned justification" for the Rule to include at least three substantive elements set out in the statute in quite explicit terms. We shall discuss them in order.

The first substantive element is "a summary of comments received from parties interested in the rule," with their names and "whether they were for or against" adoption of the rule. The order sets out this information expressly and at some length; the hospitals do not complain in

that regard. Consequently, we shall not consider the item further.

The second substantive element is "a restatement of the rule's factual bases." Nothing in the order purports to be such a restatement, even when aided by reference to the text of the Rule itself.

The third substantive element consists of "the reasons why the [Board] disagrees with party submissions and proposals." Nothing in the order amounts to a *reason* for the Board's disagreement with any submission or proposal it received. We reject as contrary to § 5(c–1)(1) the Board's theory, given at oral argument on submission of the appeal, that its *action* in finally adopting the Rule, contrary to the substance or effect of any submissions and proposals, constituted a general and sufficient "reply" to all submissions and proposals, and thus satisfied § 5(c–1)(1). The statute requires in explicit terms that the Board's *reasons* for disagreeing with party submissions and proposals be *stated in the order* as part of the agency's "reasoned justification" for its newly adopted rule. The Board's theory is untenable in light of this statutory language.

We believe the Board was required to include each of the three substantive elements in its order finally adopting Rule 42.110, for we must impute to the Legislature an intention that each part of § 5(c–1)(1) should be effective and meaningful, as opposed to inoperative or superfluous. *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597, 601 (1915). The Board wholly omitted to state in its order anything resembling "a restatement of the rule's factual bases" and the "reasons why the agency disagrees with party submissions and proposals," two of the requisite elements.[10] We believe, therefore, that the hospitals made at least a prima facie showing that the Board order was not in substantial compliance with these two requirements as they are stated in APTRA § 5(c–1)(1) in terms that are concise, specific, and unambiguous.

---

**10.** Beal, *supra*, at 645.

## WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING A TEMPORARY INJUNCTION

▮ The hospitals' entitlement to a temporary injunction, restraining enforcement of Rule 42.110 *pendente lite*, depended upon whether they satisfied the trial court on two propositions: (1) that they had a probable right to recover judgment after a final hearing on the merits, *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex.1961); and (2) that without the temporary injunction they would probably sustain an irreparable injury. *Transport Co. of Texas v. Robertson Transports*, 261 S.W.2d 549, 552 (Tex. 1953). Our review is limited to a determination of whether the trial court "abused its discretion" in the present case when it denied the hospitals' application for temporary injunction. *Brooks v. Expo Chemical Co., Inc.*, 576 S.W.2d 369, 370 (Tex.1979); *Camp*, 348 S.W.2d at 519.

### Probable Right to Recover Judgment

We have stated above our belief that the hospitals had shown prima facie that Rule 42.110 was not adopted by the Board in substantial compliance with APTRA § 5(c–1)(1), a conclusion of law based upon the face of the Board order as compared to what the statute required. Our conclusion is tantamount to a conclusion that the hospitals had shown a probable right to recover judgment after a trial on the merits, based on their claim that Rule 42.110 is invalid due to such want of substantial compliance with the statute, for APTRA § 5(e) expressly declares that no adopted rule "is valid unless adopted in substantial compliance" with APTRA § 5. 6 Lowe, Remedies § 153, at 188 (Texas Practice 2d ed. 1973). We turn then to the question of "irreparable injury," the second essential element the hospitals were bound to establish in order to obtain the temporary injunction for which they applied.

### Irreparable Injury

From the record, it appears the hospitals showed that an injustice would be imposed upon them if they were required to comply with Rule 42.110 during the course of the litigation. The Rule, which is prima facie invalid, precludes the hospitals from a course of conduct they have a legal right to pursue in the absence of a valid rule, namely the collection of their ordinary fees and charges from their workers-compensation patients. *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975).

But the likelihood of an injustice was not the end of the trial court's consideration. The hospitals' application for temporary injunction presented a more complicated case to the trial court. The court was bound to take into account other considerations evident on the face of the pleadings and in the evidence adduced at the temporary-injunction hearing—for example, the issue of comparative injury or a balancing of the "equities" and hardships, including a consideration of the important factor of the public interest. *Mitchell v. City of Temple*, 152 S.W.2d 1116, 1117 (Tex.Civ.App. 1941, writ ref'd w.o.m.).

### Abuse of Discretion

We have outlined in a previous opinion the elements for appellate consideration in deciding whether a trial court has "abused its discretion": (1) whether the issue was committed by law to the trial court's discretion; (2) whether the court purported to exercise that discretion; (3) whether the appellate record revealed the trial court had sufficient facts upon which the court might rationally exercise its discretion; (4) and whether the court exercised its discretion erroneously, in any one of several ways, to the complaining party's injury. *Landon v. Jean–Paul Budinger, Inc.*, 724 S.W.2d 931 (Tex.App.1987, no writ). We noted in *Landon* that in the absence of an appellate record demonstrating the reasoning employed by the trial court, in any exercise of the discretion vested in that court by law, an appellate court must *presume* in many cases that the trial-court decision is free of error amounting to an "abuse of discretion." The appellate court may have to assume, for example, that the trial court reached its decision after considering only the legally relevant factors, and that the court did not omit or exaggerate any of them. *Id.*, at 941. We believe the

present appeal requires that we affirm the trial-court order on that basis.

We believe the trial court possessed the undoubted authority to restrain the enforcement of Rule 42.110 pending a trial on the merits concerning the hospitals' allegations that the rule was invalid for want of substantial compliance with the rule-making procedures of APTRA § 5. *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d at 528. We believe, moreover, that the hospitals' application required the trial court to exercise its power of discretion in that regard, and the record is quite clear that the court did so by choosing, after an evidentiary hearing, not to issue the temporary injunction.

But the appellate record does not apprise us of the trial court's reasoning in denying the hospitals' application for temporary injunction. The appellate record does not include any findings of fact or conclusions of law explaining the trial court's reasoning. The Board's *brief* in this Court includes, as an attachment, a document entitled "Findings of Fact" and it is doubtless a document signed by the trial judge and filed in the trial court. Even considering that extraneous document, however, we are not really apprised of the trial court's reasoning in denying the hospitals' application for temporary injunction—the document merely identifies various parties and summarizes the legal effect of several statutes, the Rule, and the Board's order adopting the Rule, together with the trial court's opaque "Conclusions of Law" that the Rule is valid, that it was adopted in substantial compliance with APTRA, that the hospitals have not shown a probable right to injunctive relief, and that the hospitals have failed to show "a probable injury that would authorize issuance of a temporary injunction."

That the hospitals may have a legal right to charge greater sums in the face of a rule that is prima facie invalid was not the sole factor the trial court was bound to consider—it was bound to balance the "equities" and hardships, considering, as mentioned above, the public interest symbolized by the Board's Rule and the likelihood of an early trial on the merits as bearing on the necessity for the temporary injunction. How the trial court weighed and adjusted these factors in reaching its order is not shown in the appellate record. Other factors suggest themselves, but we need not pursue the matter further. We are bound to indulge all reasonable presumptions in support of the trial-court order, and we do so. *International Union of Operating Engineers v. Cox*, 148 Tex. 42, 219 S.W.2d 787, 788–89 (1949).

Because the appellate record does not demonstrate that the trial court abused its discretion in denying the hospitals' application for temporary injunction, we affirm the order of that court.

GAMMAGE, J., not participating.