The CITY OF BEAUMONT,
Texas, Appellant,

v.

Mark SPIVEY, Appellee.

No. 09–97–376CV.

Court of Appeals of Texas,
Beaumont.

Submitted April 22, 1999.

Decided Oct. 7, 1999.

Rehearing Overruled Oct. 28, 1999.

---

9. *Ponder v. Texarkana Mem'l Hosp., Inc.*, 840 S.W.2d 476, 479 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

10. *See* TEX.R.APP. P. 44.1(a)(1).

Bruce W. Cobb, Joseph P. Sanders, Sr. Assistant City Attorney, Beaumont, for appellant.

Steven L. Carnes, San Antonio, Robert J. Thomas, Houston, for appellee.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

Seeking reinstatement as a police officer with the City of Beaumont, Texas, ("City"), Mark Spivey ("Spivey") filed an action for mandamus in district court. After a non-jury trial, the district court granted final judgment in favor of Spivey, ordered the City to reinstate Spivey as a city police officer with full seniority, back pay, and benefits, and awarded Spivey attorney's fees. The City appeals the trial court's ruling.

After taking an entry level examination in May 1991 and scoring the second highest grade on the exam, Mark Spivey was hired on August 15, 1991, as a police officer with the Beaumont Police Department ("BPD"). By late 1994, the Beaumont Po-

lice Department had begun an investigation of Spivey after allegations surfaced that he had obtained a copy of the entry level exam from former Beaumont police officer, Lieutenant Michael Siebe,[1] prior to actually taking the May 1991 examination. At the conclusion of the department's investigation of the charges against Spivey, Chief of Police Thomas Scofield terminated Spivey's employment on January 9, 1995.

Under the Texas Municipal Civil Service statute,[2] found in Chapter 143 of the Texas Local Government Code, applicants for the position of "police officer" take a "competitive" entry level examination. TEX. LOC. GOV'T CODE ANN. § 143.025(a). Based on the results of these examinations, eligibility lists are created for the beginning positions, and from the lists, appointments are made. TEX. LOC. GOV'T CODE ANN. § 143.025(b). In Spivey's case, the police department concluded he had obtained and studied a copy of the actual examination prior to actually taking the test. For that reason, Spivey's employment was terminated.

Under Chapter 143 and the collective bargaining agreement between the City of Beaumont and the Beaumont Police Officers Association, a police officer has certain due process rights that are triggered whenever the officer is subjected to disciplinary action such as suspension or, in this case, dismissal. *See* TEX. LOC. GOV'T CODE ANN. § 143.052. Upon receipt of the termination letter from Chief Scofield, however, Spivey was not accorded those rights. Under Chapter 143, Spivey was not advised of the actual civil service rules he had violated,[3] he was not informed of his right to appeal to a third party hearing examiner,[4] and the civil service commission was not informed of his termination within 120 hours of January 9, 1995.[5] Furthermore, Spivey was denied any rights under the grievance procedure of the collective bargaining agreement.

With all administrative remedies denied him, Spivey then filed in district court a "motion for writ of mandamus"[6] in which he sought reinstatement to his position, along with back pay. He claimed his termination was invalid, because of the deprivation of his rights under Texas civil service law and the collective bargaining agreement. In contrast to Spivey's assertions, the City, in effect, interposed an affirmative defense, or an avoidance, to Mark Spivey's claim for reinstatement. According to the City, reinstatement was not required, because Spivey's misconduct regarding the exam made his employment void *ab initio* because he cheated on the examination. Such conduct rendered his appointment as an officer a nullity, and, consequently, he had no rights under Chapter 143 or the bargaining agreement.

■ A district court may issue a writ of mandamus in order to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex.1991). "An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Id.* The

---

1. Michael Siebe was convicted in 1995 of possession with intent to distribute a controlled substance and money laundering.

2. All references in this opinion to the Municipal Civil Service statute are to TEX. LOC. GOV'T CODE ANN. §§ 143.001–143.363 (Vernon 1999).

3. TEX. LOC. GOV'T CODE ANN. § 143.052(e).

4. TEX. LOC. GOV'T CODE ANN. § 143.057.

5. TEX. LOC. GOV'T CODE ANN. § 143.052(c).

6. A mandamus action in district court has been employed by police officers, among others, seeking reinstatement to their positions. *See Bichsel v. Carver*, 159 Tex. 393, 321 S.W.2d 284 (1959); *City of Houston v. Meister*, 882 S.W.2d 29 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *City of Plano Firefighters' and Police Officers' Civil Serv. Comm'n v. Maxam*, 685 S.W.2d 125 (Tex. App.—Dallas 1985, writ ref. n.r.e.); *Amarillo Civil Serv. Comm'n v. Vitatoe*, 556 S.W.2d 648 (Tex.Civ.App.—Eastland 1977, no writ).

ministerial act in question is the reinstatement of Mark Spivey to the position of police officer. According to the statute, prompt reinstatement was required if Spivey was not accorded the rights specified in § 143.052(e). Tex. Loc. Gov't Code Ann. § 143.052(f) (Vernon 1999).

■■■ As in *City of Seven Points,* the mandamus action in this case is governed by the following standard:

An action for a writ of mandamus initiated in the trial court is a civil action subject to appeal as any other civil suit. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 792 n. 1 (Tex.1991). Therefore, we do not review the trial court's findings of fact and conclusions of law under the abuse of discretion standard applicable to mandamus actions originating in appellate courts. *Id.* at 794 n. 2. We review them in accordance with the standards generally applicable to trial court findings and conclusions. That is, we review findings of fact for legal and factual evidentiary support, *id.* at 794, and we review conclusions of law de novo, *City of Austin v. Austin Prof'l Fire Fighters Ass'n,* 935 S.W.2d 179, 181 (Tex.App.—Austin 1996), *judgment vacated pursuant to settlement,* No. 97–0077(Tex.1997).

*University of Tex. Law Sch. v. Texas Legal Found.,* 958 S.W.2d 479 (Tex.App.—Austin 1997, no writ). Thus, the trial court's findings of fact and conclusions of law in an action for mandamus in district court are reviewable by the same standards as in other civil suits.

In addition to the issues raised by the City on appeal, Spivey, by way of cross point, has raised an insufficient evidence claim, challenging two of the trial court's findings of fact. Of necessity, we review the cross point in conjunction with the City's claim that Spivey's employment is void. If our review of the record reveals the evidence is insufficient to show that Spivey possessed the actual test before taking it in May 1991 and cheated on the examination, then the act of reinstatement is simply a ministerial one, and the trial court was correct in granting the motion for mandamus. On the other hand, if our evidentiary review reveals the evidence in support of the findings is not so weak as to be manifestly unjust, then the trial court's judgment is in error.

The City raises seven issues on appeal. In issue one, the City urges that Spivey's appointment was void *ab initio* and, consequently, he was not entitled to any rights under Chapter 143 or the collective bargaining agreement. In issue two, the City claims the trial court's conclusions of law, which hold Spivey did not violate Chapter 143, were erroneous. In both issues, the City's claims are based on the statutory interpretation of various sections of Chapter 143, which, in pertinent part, are set out below:

§ 143.003. **Definitions**

. . .

(5) "Police officer" means a member of a police department or other peace officer who was appointed in *substantial compliance* with this chapter. . . .

Tex. Loc. Gov't Code Ann. § 143.003(5) (Vernon 1999) (emphasis added).

§ 143.021. **Classification; Examination Requirements**

. . .

(c) . . . [A]n existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter.

Tex. Loc. Gov't Code Ann. § 143.021 (Vernon 1999).

§ 143.025. **Entrance Examinations**

(a) The commission shall provide for open, *competitive,* and free entrance examinations to provide eligibility lists for beginning positions in the fire and police departments. The examinations are open to each person who makes a proper

application and meets the requirements prescribed by this chapter.

(b) An eligibility list for a beginning position in the fire or police department may be created only as a result of a *competitive examination* held in the presence of each applicant for the position. The examination must be based on the person's knowledge of and qualifications for fire fighting and work in the fire department or for police work and work in the police department and must inquire into the applicant's general education and mental ability. *A person may not be appointed to the fire or police department except as a result of the examination.*

TEX. LOC. GOV'T CODE ANN. § 143.025(a),(b) (Vernon 1999) (emphasis added).

### § 143.026. Procedure for Filling Beginning Positions

(a) When a vacancy occurs in a beginning position in a fire or police department, the department head shall request in writing from the commission the names of suitable persons from the eligibility list. The director shall certify to the municipality's chief executive the names of the three persons having the highest grades on the eligibility list.

(b) From the three names certified, the chief executive shall appoint the person having the highest grade unless there is a valid reason why the person having the second or third highest grade should be appointed.

TEX. LOC. GOV'T CODE ANN. § 143.026 (Vernon 1999).

### § 143.027. Probationary Period

. . .

(d) A fire fighter or police officer who was appointed in substantial compliance with this chapter and who serves the entire probationary period [one year from date of employment] automatically becomes a full-fledged civil service employee and has full civil service protection.

TEX. LOC. GOV'T CODE ANN. § 143.027(d) (Vernon 1999).

■ We are mindful that "[a] fundamental principle of civil service is that appointments must be made according to merit and fitness, ascertained by competitive examinations." *Klinger v. City of San Angelo*, 902 S.W.2d 669, 671 (Tex.App.—Austin 1995, writ denied). The stated purpose of Chapter 143 is "to secure efficient fire and police departments composed of capable personnel who are free from political influence and who have permanent tenure as public servants." TEX. LOC. GOV.CODE ANN. § 143.001 (Vernon 1999).

According to the City's argument under its first three issues, Spivey's appointment was not in "substantial compliance" with Chapter 143, because Spivey's conduct in possessing and studying the actual test prior to the examination meant the exam was not a competitive one. Section 143.025(a),(b) requires that the entry level examinations be "open, competitive, and free" and that a person may not be appointed except as a result of the examination.

■ The construction of a statute is a question of law for the court, and we consider the issue *de novo*. *See City of Dallas v. Cornerstone Bank*, 879 S.W.2d 264, 269 (Tex.App.—Dallas 1994, no writ). In interpreting a statute, a court must diligently attempt to determine and give effect to the legislature's intent. *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 960 (Tex.1999). Legislative intent must be determined from the entire act, not from isolated portions thereof. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex.1990). To ascertain legislative intent, we look first to the statute's plain and common meaning. *Albertson's*, 984 S.W.2d at 960. We give words their plain meaning unless they are given a particular meaning by statutory definition or otherwise. *See* TEX. GOV'T CODE ANN. § 311.011 (Vernon 1998).

In our construction of certain words in Chapter 143, we first look to § 143.003, which contains the statutory definition of a "police officer." A police officer is defined as a member of a police department who "was appointed in substantial compliance with this chapter."[7] As noted by other courts in their interpretations of other statutes, "'substantial compliance' does not mean literal and exact compliance with every requirement of a statute, but simply 'compliance' with the 'essential' requirements of the statute." *Methodist Hospitals of Dallas v. Texas Indus. Acc. Bd.*, 798 S.W.2d 651, 654 (Tex. App.—Austin 1990, writ dism'd w.o.j.); *see also Harris County Appraisal Dist. v. Bradford Realty*, Ltd., 919 S.W.2d 131, 135 (Tex.App.—Houston [14th Dist.] 1994, no writ). Sections 143.025(a) and (b) require that an applicant for a beginning position in the police department must sit for an open, competitive examination and "may not be appointed to the ... police department except as a result of the examination." As noted above, the eligibility lists for the beginning positions are then created from the results of the competitive examinations. *See* § 143.025(a). An officer may only become a full-fledged civil service employee with full civil service protection if he is appointed in substantial compliance with Chapter 143 and has served the entire probationary period. TEX. LOC. GOV'T CODE ANN. § 143.027(d) (Vernon 1999). We conclude that a competitive exam is one of those "essential requirements" of the statute, and that to be in "substantial compliance" with the Act, an applicant must take a competitive exam.

Although we find no Texas case directly on point, we construe the pertinent sections in Chapter 143 to mean that the appointment of an individual as a police officer is void if that person has engaged in conduct that would make his exam *vis-a-vis* the other examinees non-competitive. The dictionary definitions of "competitive" and "competition" indicate that such terms have to do with "the act or action of seeking to gain what another is seeking to gain at the same time and usu[ally] under or as if under fair or equitable rules and circumstances: a common struggle for the same object esp[ecially] among individuals of relatively equal standing. *Webster's Third New International Dictionary Unabridged* 464 (1986). For an exam to be competitive, it must, at the very least, involve examinees who have not received copies of the actual test and answers prior to taking the examination. Thus, if Spivey, as the trial court stated in finding of fact nineteen, "cheated on the entry level police civil service examination," we conclude his examination was rendered non-competitive by his conduct, his employment was void *ab initio*, and he is not entitled to protection under Chapter 143 or the bargaining agreement.

Although we agree with the City's contention in issue one that an officer's appointment may, under certain narrow circumstances, be rendered void *ab initio*, we cannot dispose of issue one until other issues in the case are resolved. We turn now to issue two wherein the City claims the trial court's conclusions of law two, three, four, five, and seven are erroneous, because they conclude Spivey did not "violate" Chapter 143. The conclu-

---

7. *See Hernandez v. City of Fort Worth*, 617 S.W.2d 923 (Tex.1981) (Park rangers were not policemen within the definition of the civil service act because they were not selected, appointed, or promoted to classified positions within the police department, as required by the Act.); *City of Wichita Falls v. Harris*, 532 S.W.2d 653, 657–58 (Tex.Civ. App.—Fort Worth 1975, writ ref'd n.r.e.) (Appointment without an examination of a "fire training specialist" to a newly created posi-

tion in fire department was found to be void, because the appointment was not made in substantial compliance with provisions of the civil service statute.); *but cf. Cole v. City of Houston*, 442 S.W.2d 445, 448–49 (Tex.Civ. App.—Houston [14th Dist.] 1969, no writ) (Officer who was appointed after oral exam and who enjoyed benefits of civil service employment met substantial compliance requirement.)

sions of law are based on findings of fact eleven, twelve, and nineteen, which declare that Spivey was given the actual entry examination prior to taking it, that he knew this was a departure from accepted standards and practices, and that he cheated on the May 13, 1991, exam. These findings of fact by the trial court, unless challenged by a point of error on appeal, are binding on the appellate court. *Brown v. The State Bar of Tex.*, 960 S.W.2d 671, 674 (Tex.App.—El Paso 1997, no writ). The trial court's conclusions of law, however, are not binding on this Court, and we are free to make our own legal conclusions. *Id.*

> Conclusions of law are reviewable when attacked as a matter of law, but not on grounds of sufficiency of the evidence, as if they were findings of fact. Although a trial court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness.

*Arthur M. Deck & Assoc. v. Crispin*, 888 S.W.2d 56, 60 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Based on the trial court's own findings recited above and on our statutory construction of the sections in Chapter 143 dealing with "substantial compliance," competitive examinations, and appointments, we hold the trial court's conclusions that Spivey did not violate Chapter 143 are incorrect. Under our construction of Chapter 143, the trial court's findings of fact eleven, twelve, and nineteen lead inescapably to the conclusion that Spivey violated Chapter 143.

We would conclude our analysis here but for the fact that Spivey did challenge two of the findings of fact. In his cross point on appeal, Spivey contends the evidence is insufficient to support findings of fact eleven and nineteen—that Spivey had the actual test prior to the examination and that he "cheated on the entry level police civil service examination administered by the City of Beaumont on May 13, 1991."

Although the trial court's findings of fact have the same force and dignity as a jury's verdict, they are not conclusive when a complete reporter's record is presented on appeal. *J. & J. Marine, Inc. v. Le*, 982 S.W.2d 918, 924 (Tex.App.—Corpus Christi 1998, no pet.). An appellant may challenge the findings by raising both legal and factual sufficiency of the evidence points. *See Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex.1989). When such points are raised, the standard of review to be applied is the same as that to be applied in a review of jury findings. *City of Seven Points*, 806 S.W.2d at 794.

In reviewing a no evidence or legal insufficiency attack, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which support the findings. In doing so, we must disregard all evidence or reasonable inferences therefrom to the contrary. If there is more than a scintilla of probative evidence supporting the finding of the trial court, the point will be overruled.

A factual insufficiency challenge requires us to examine the entire record to determine if there is some probative evidence to support the finding, and if so, whether that evidence is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

*In Interest of Striegler*, 915 S.W.2d 629, 638–39 (Tex.App.—Amarillo 1996, writ denied) (citations omitted). Spivey claims the evidence supporting findings of fact eleven and nineteen is factually insufficient.

In finding of fact nineteen, the trial court found Spivey cheated on the exam. The term "cheat" is not contained in the civil service statute, the civil service commission rules, or the collective bargaining agreement. Therefore, we take its common meaning from *Webster's Dictionary*. To "cheat" is "to deprive of something

valuable by the use of deceit or fraud"; "to condition, influence, or lead by or as if by deceit, trick, or artifice." *Webster's Third New International Dictionary Unabridged,* 381 (1986). The concept of cheating, then, encompasses trickery, deceit, and fraud, all of which involve concealment or failure to disclose.

In determining whether the evidence was factually insufficient to support the finding, we look to who had the burden of proof at trial. Because the City, in effect, uses the "cheating" allegation as an affirmative defense to its duty to afford Spivey certain due process rights upon dismissal, the City, not Spivey, had the burden of proving Spivey cheated on the exam. Therefore, on his claim of factual insufficiency regarding the finding of cheating, Spivey was required to show there was insufficient evidence to support the adverse finding. *See Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). With that burden in mind, the appellate court should set aside the finding only if the evidence which supports the finding is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). A recitation of the evidence follows.

The record reveals Spivey was given material to study for the exam by former police officer Michael Siebe, who was related to Spivey by marriage. Spivey testified Siebe gave him a "sample test" and answer sheet while they were on a fishing trip together and told him to look it over. During the City's questioning of Spivey at trial, the following exchange occurred:

Q. [City] At the time that Lieutenant Siebe delivered the paperwork to you, did he make the statement, "I didn't have to mention it to anybody; but if anybody ever asked me, to tell them I was given a sample booklet[.]"

. . .

A. [Spivey] He told me I didn't have to mention it; but if anybody ever asked me, to tell the truth, that he gave me a sample test.

Q. And did he go on to tell you that if you ever lied about it, that—and you did become a police officer, that you could be terminated?

A. He told me that if I was ever asked about it, to tell the truth, that I was given a sample booklet, and if I ever lied about it, I could be terminated.

Spivey admitted that in an earlier interview with an FBI agent, he had responded to the agent's question as to whether the sample test was like the actual test by stating "I would say it was." Spivey later testified at trial that he had said it was "similar, but not exact." After he obtained the material from Siebe, Spivey said he looked it over a "couple of times" and then threw it in the trash. Another witness, Sgt. Clay Woodward of BPD, indicated Spivey told a different story to him. Woodward testified Spivey came to him after Spivey received a "blue letter" from the Internal Affairs Investigation Department (I.A.D.), and told Woodward that he (Spivey) had not had a study guide from the City for the exam. Sgt. Woodward indicated his own nephew, who probably took the exam around 1991, had a study guide.

Another witness called by the City was Sue Dismukes, a former assistant civil service director. At the time of trial, she was personnel manager for the City of Beaumont. In March or April 1991, Dismukes was involved in processing applications for entry level police officer positions for the City. She testified Spivey's score on the entry level exam was 148, the second highest score on the written portion of the exam. She also indicated that Spivey had gone through the tenth grade and later received a GED. Other testimony revealed Spivey had attended the police academy where he had ranked next to last in his class.

Upon being questioned about the entry level civil service test, Dismukes testified there were no study guides or sample tests for the March 1991 exam. She further

explained that she delivered the actual civil service exam to Siebe and Sgt. Earney so that they could take the exam to colleges in Louisiana for recruiting purposes. She also stated that Earney and Siebe administered the exam in Louisiana around March 1991. It was the first time the City allowed the actual civil service exam to be taken "on the road" and administered. While Dismukes indicated she did not believe the manufacturer made a sample test for the particular exam given in 1991, she also stated she did not know whether Siebe could have obtained a sample test or an old test from the manufacturer.

Sgt. Earney, who worked in the BPD personnel office at that time, had a file of test booklets which were sent to him by different test "purveyors" for his review. If anyone had asked for one, he would have given it to him. Earney's files, which were open to Siebe, included old tests, sample tests, and sample booklets. Earney also testified he and Siebe had received from Dismukes one copy of the actual examination which they were to take with them when they went to Louisiana for recruiting and testing purposes. According to Earney, they made two trips to Louisiana, one of them being in April 1991, which was shortly before the May 13, 1991, examination taken by Spivey. Since Siebe had access to all the files in Earney's office, Siebe would have had access to that exam and the answers to it. Although Earney testified he did not know if Siebe obtained copies of the exam before Spivey took the test, he said, "[t]hey were available in my office." Earney acknowledged he did not know if Siebe had done anything to help Spivey, but he also stated that Siebe told him that his (Siebe's) family had contacted Siebe to assist in the employment of Spivey. At the time, Earney said Siebe "played it down."

In addition to Dismukes, five other witnesses attested to the unavailability of study guides or sample tests during the time frame in question. Robert Smith, Jr., Rebecca Duke, and Trina Warden took the March 1991 exam, along with Mark Spivey. Smith testified he did not have a study guide or a sample test for the March 1991 exam or for the four or five other times he took the entry level exam prior to that. Rebecca Duke likewise stated that no one from the City or the Beaumont Police Department gave her a sample booklet or study guide to prepare for the exam. She was able to purchase a manual from a bookstore in Beaumont, but as far as she knew, the publisher of the manual was not also the publisher of the test. Lisa Sheffield, a BPD employee for seventeen years, testified she distinctly remembers there were no study guides for the May 13, 1991, exam, although they did become available in 1992. Both the City and Spivey stipulated that Trina Warden also would testify she had no study guides available to her at the time of the examination. The fifth witness to testify regarding the unavailability of study guides and booklets prior to 1992 was Chief Scofield, who indicated they did not become available until 1992. None of the five witnesses, however, had any personal knowledge of Spivey's having possession of the actual test prior to the exam in May 1991. Their testimony was simply that there were no sample tests or booklets from the City for that particular exam.

Dismukes also testified that she ordered no study guides or booklets for the ALERT exam, which was the one taken by Spivey, Smith, Duke, and Warden in May 1991, and that she did not believe any study guides were available for the ALERT exam. In addition, the instruction form from the testing company, which was admitted into evidence, shows study guides available from the manufacturer for other types of exams, but no study guides available from the manufacturer for the ALERT exam.

The City also offered the testimony of IRS agent Judy Stanley and FBI agent Norman Townsend, who interviewed Spivey in September 1994 regarding the allegations about the exam. At the beginning

of the interview, Spivey maintained he had received a sample test. By the end of the interview, however, Spivey told them "it did seem like it [study material that Siebe had given him] was the actual test." According to Townsend, Spivey acknowledged he probably had received the actual test and answers and that he probably should not have had them. However, Townsend said Spivey also stated that no one told him that was wrong, and "nobody told him ahead of time about it." Spivey also indicated to Townsend that it appeared to him, after he took the examination, that he may have had the actual exam and answers prior to May 13, 1991. However, Spivey made no such disclosure either during the examination or thereafter until he was confronted with the allegations against him. According to Agent Townsend, Spivey explained that Siebe helped him get his foot in the door. On cross examination by Spivey's trial counsel, Agent Stanley stated she had no direct knowledge that Spivey committed a fraudulent act in obtaining his employment as an officer.

In addition to his interview with Mark Spivey, agent Townsend conducted a separate interview with Mike Siebe. Townsend's clear impression of the interview with Mike Siebe was that Siebe had done something wrong concerning the testing procedure. According to Townsend, Siebe acknowledged helping Spivey get on with the department by giving Spivey a copy of the test. Townsend's summary report, which was made subsequent to the interview, stated the following: "Siebe gave Spivey information provided by the State that would not have been provided to others taking the test" and "may have included actual test answers or examples of questions on the test." Townsend admitted he did not ask Siebe if Siebe had obtained samples from test manufacturers or if Siebe had given Spivey a copy of an old test. No audio or video tape or other transcription was made of the interview. In contrast to Townsend's account of his interview with Siebe, Mike Siebe himself

testified at deposition that he never had the actual exam in his possession, and, to the best of his knowledge, he only gave Spivey a few pages of sample questions that he had obtained from Sgt. Earney.

In the deposition testimony of Dwana Siebe, she stated that Siebe told her prior to his arrest that he had obtained a test for Spivey to review. Subsequent to his arrest, however, Siebe told Dwana he gave Spivey a sample exam which was given to all applicants to study.

▮ As noted above, the evidence is completely circumstantial. Circumstantial evidence, and inferences therefrom, however, can be a sufficient basis for finding an ultimate fact. *See Russell v. Russell,* 865 S.W.2d 929, 933 (Tex.1993). The issue in this instance is whether there is any evidence from which reasonable minds could draw an inference that Spivey was given the actual test prior to May 13, 1991, and that he cheated on the examination. If the circumstances are consistent with either of two sets of facts, and nothing shows that one is more probable than the other, then neither fact can be inferred. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 278 (Tex.1995). When all the evidence is considered, circumstantial though it may be, and keeping in mind that the trial court had the opportunity to hear Spivey's testimony, observe his demeanor, and evaluate his credibility, we conclude that the evidence supporting the finding that Spivey cheated on the entry level examination is not so weak as to be clearly wrong and manifestly unjust. Based on our review of the record, we conclude the evidence is factually sufficient to support the trial court's finding. We, therefore, overrule Spivey's cross point.

▮ Since we uphold the factual sufficiency of the trial court's finding that Spivey was given the actual exam prior to taking it and that he cheated on the examination, we also hold that Spivey's appointment was not based on a competitive examination, as required by § 143.025(a),(b). Therefore, his appointment as a police offi-

cer was not in substantial compliance with Chapter 143 and is void *ab initio.* As a result, Spivey had no rights under Chapter 143 or the collective bargaining agreement. The trial court erred in granting the "motion for writ of mandamus." The City's first issue is sustained.

Because we have sustained the City's first issue and overruled Spivey's cross point, we need not address the City's remaining issues. We reverse the judgment of the trial court, set aside and vacate the writ of mandamus, and deny Spivey's motion for damages for frivolous appeal.

REVERSED AND WRIT OF MANDAMUS SET ASIDE AND VACATED.

DON BURGESS, Justice, concurring and dissenting.

I reluctantly concur with the majority's holding that the trial judge's finding that Spivey cheated on his entrance exam is not so weak as to be manifestly unjust. As the majority points out, the evidence is mainly circumstantial and the trial judge had the opportunity to make the determination, therefore, I must respect that prerogative and not substitute my judgment for his.

I respectfully dissent to the majority's holding that Spivey had no rights under Chapter 143. The trial judge was quite correct in his conclusion of law number 7 where he stated:

> There is nothing in the statutory law nor in the decisional law of this state which permits this Court to depart from the application of Section 143 of the Local Government Code and the section under that portion of the statute in this particular. [sic]

The majority is also correct that the failure to be appointed as a result of a competitive exam does not confer Chapter 143 rights upon a individual. However, all the cases holding so, involved the failure to administer or take a competitive exam, not cheating on an exam. Unfortunately, all contingencies are seldom covered in legislation.

The legislature established a system for the appointment of police that includes the requirement for an entrance examination. TEX. LOC. GOV'T CODE ANN. § 143.025 (Vernon 1999).[8] In reviewing the entire legislative scheme, the word "competitive" is not defined. Yet, it appears when used in

8. § 143.025. Entrance Examinations

(a) The commission shall provide for open, competitive, and free entrance examinations to provide eligibility lists for beginning positions in the fire and police departments. The examinations are open to each person who makes a proper application and meets the requirements prescribed by this chapter.

(b) An eligibility list for a beginning position in the fire or police department may be created only as a result of a competitive examination held in the presence of each applicant for the position. The examination must be based on the person's knowledge of and qualifications for fire fighting and work in the fire department or for police work and work in the police department and must inquire into the applicant's general education and mental ability. A person may not be appointed to the fire or police department except as a result of the examination.

(c) An applicant may not take an examination unless at least one other applicant taking the examination is present.

(d) Examinations for beginning positions in the fire department may be held at different locations if each applicant takes the same

examination and is examined in the presence of other applicants.

(e) An additional five points shall be added to the examination grade of an applicant who served in the United States armed forces, received an honorable discharge, and made a passing grade on the examination.

(f) An applicant may not take the examination for a particular eligibility list more than once.

(g) The commission shall keep each eligibility list for a beginning position in effect for a period of not less than six months or more than 12 months, unless the names of all applicants on the list have been referred to the appropriate department. The commission shall determine the length of the period. The commission shall give new examinations at times the commission considers necessary to provide required staffing for scheduled fire or police training academies.

(h) The grade to be placed on the eligibility list for each applicant shall be computed by adding an applicant's points under Subsection (e), if any, to the applicant's grade on the written examination. Each applicant's grade

the context of requiring a "competitive" examination, the legislature used the term to mean competition among applicants.

The legislature dealt with inappropriate or illegal behavior within the civil service scheme. TEX. LOC. GOV'T CODE ANN. § 143.051 [9] (Vernon 1999) sets out the various grounds for removal or suspension.

While cheating on the entrance examination is not explicitly a ground for removal, it is certainly implicitly covered under sections 143.051(6) and (8). Unfortunately for the city, the legislature also set up a scheme for disciplinary suspensions, TEX. LOC. GOV'T CODE ANN. § 143.052 [10] (Vernon 1999), and included is the "180 day" rule. This rule requires that the act complained

on the written examination is based on a maximum grade of 100 percent and is determined entirely by the correctness of the applicant's answers to the questions. The minimum passing grade on the examination is 70 percent. An applicant must pass the examination to be placed on an eligibility list.

9. § 143.051. Cause for Removal or Suspension

A commission rule prescribing cause for removal or suspension of a fire fighter or police officer is not valid unless it involves one or more of the following grounds:

(1) conviction of a felony or other crime involving moral turpitude;

(2) violations of a municipal charter provision;

(3) acts of incompetency;

(4) neglect of duty;

(5) discourtesy to the public or to a fellow employee while the fire fighter or police officer is in the line of duty;

(6) acts showing lack of good moral character;

(7) drinking intoxicants while on duty or intoxication while off duty;

(8) conduct prejudicial to good order;

(9) refusal or neglect to pay just debts;

(10) absence without leave;

(11) shirking duty or cowardice at fires, if applicable; or

(12) violation of an applicable fire or police department rule or special order.

10. § 143.052. Disciplinary Suspensions

(a) This section does not apply to a municipality with a population of 1.5 million or more.

(b) The head of the fire or police department may suspend a fire fighter or police officer under the department head's supervision or jurisdiction for the violation of a civil service rule. The suspension may be for a reasonable period not to exceed 15 calendar days or for an indefinite period. An indefinite suspension is equivalent to dismissal from the department.

(c) If the department head suspends a fire fighter or police officer, the department head shall, within 120 hours after the hour of suspension, file a written statement with the commission giving the reasons for the suspension. The department head shall immediately deliver a copy of the statement in person to the suspended fire fighter or police officer.

(d) The copy of the written statement must inform the suspended fire fighter or police officer that if the person wants to appeal to the commission, the person must file a written appeal with the commission within 10 days after the date the person receives the copy of the statement.

(e) The written statement filed by the department head with the commission must point out each civil service rule alleged to have been violated by the suspended fire fighter or police officer and must describe the alleged acts of the person that the department head contends are in violation of the civil service rules. It is not sufficient for the department head merely to refer to the provisions of the rules alleged to have been violated.

(f) If the department head does not specifically point out in the written statement the act or acts of the fire fighter or police officer that allegedly violated the civil service rules, the commission shall promptly reinstate the person.

(g) If offered by the department head, the fire fighter or police officer may agree in writing to voluntarily accept, with no right of appeal, a suspension of 16 to 90 calendar days for the violation of a civil service rule. The fire fighter or police officer must accept the offer within five working days after the date the offer is made. If the person refuses the offer and wants to appeal to the commission, the person must file a written appeal with the commission within 15 days after the date the person receives the copy of the written statement of suspension.

(h) In the original written statement and charges and in any hearing conducted under this chapter, the department head may not complain of an act that occurred earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer. If the act is allegedly related to criminal activity including the violation of a federal, state, or local law for which the fire fighter or police officer is subject to a criminal penalty, the department head may not complain of

of, unless related to criminal activity, be within 180 days of the suspension. If the act is related to criminal activity then there is a "discovery" rule. Thus, it is the legislature which has "hamstrung" the city and this court must interpret the laws rather than make them. *See,* TEX. CONST. art. II, § 1; *Houston Chronicle Pub. Co. v. Woods,* 949 S.W.2d 492, 498 (Tex.App.— Beaumont 1997, no writ)(citing *State v. Mancuso,* 919 S.W.2d 86, 87 (Tex.Crim. App.1996)).

In summary, I commiserate with the dilemma of the trial court; but the trial

an act that is discovered earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer. The department head must allege that the act complained of is related to criminal activity.

court got it right. Under the law, as currently written, a cheater must be ferreted out and suspended within 180 days or there must be some other reason to initiate disciplinary measures.[11] Consequently, I must reluctantly dissent.

11. For instance, if the individual fails to cooperate with the investigation or makes false statements during the investigation.