TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-03-00229-CV






Phillips Petroleum Company, Appellant


v.


Texas Commission on Environmental Quality and Sweeny

Cogeneration Limited Partnership, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN200286, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING




O P I N I O N



 Appellant Phillips Petroleum Company ("Phillips") contends by one issue that the
district court erred in affirming a decision by appellee Texas Commission on Environmental Quality (1)
to grant nitrogen oxide (NOx) emissions allowances for eight boilers to appellee Sweeny
Cogeneration Limited Partnership ("SCLP"). Phillips claimed entitlement to the allowances as the
owner of the boilers, whereas SCLP claimed entitlement because it controlled the boilers in a
cogeneration facility that it operated within Phillips's refinery. Phillips argues that the Commission
acted arbitrarily and unreasonably by considering SCLP's "operational control" instead of Phillips's
ownership in allocating the allowances. For the reasons set forth below, we affirm the judgment of
the district court affirming the decision of the Commission.


BACKGROUND

 In late 1995, Phillips and SCLP entered into an agreement for SCLP to construct and
operate a cogeneration (2) facility at Phillips's refinery in Brazoria County. To be able to build three
new cogeneration units, SCLP had to obtain an air quality permit from the Commission for new NOx
emissions. Because the facility would be located in the Houston-Galveston Clean Air Act ozone
nonattainment area, designated by the EPA for reduction in NOx emissions, the permitting process
had additional requirements.

 The Commission considered the new facility to be a major source of NOx emissions
because it would emit more than twenty-five tons per year. Permitting of major sources required the
Commission to conduct a Nonattainment Area New Source Review (NNSR), which involved more
strict and costly emissions control requirements than those for facilities exempt from the NNSR. A
new facility could avoid the NNSR requirements, however, through a process of "site-wide
emissions netting," that is, averaging increased emissions from a new source of emissions with
decreased emissions from an existing source.

 To avoid the NNSR requirements, SCLP included in its air quality permit application
a plan to net emissions from the eight existing boilers with emissions from the new cogeneration
units. The Commission determined that SCLP's application was deficient, in part because SCLP did
not submit sufficient proof that it would "maintain ultimate operational control" over the boilers. 
Upon a representation by Phillips that it "agrees that it has no authority independent of the
Partnership's authority under the permit, to cause emissions from the boilers," the Commission
issued the air quality permit to SCLP.

 In December 2000, the Commission issued new rules creating the Mass Emissions
Cap and Trade (MECT) program to reduce NOx emissions in the Houston-Galveston area. See 30
Tex. Admin. Code §§ 101.350-.363 (2003). Under this program, the Commission planned to
allocate emissions "allowances" to existing facilities, based on their emissions for the years 1997
through 1999. Id. §§ 101.351, .360(a)(1). In June 2001, Phillips and SCLP filed competing
applications claiming entitlement to the emissions allowances for the boilers. The Commission
allocated the allowances to SCLP. Phillips contested the Commission's determination and requested
redistribution of the allowances to itself as the owner of the boilers. The executive director of the
Commission responded that the original allocation was proper, with the "most persuasive factor"
being that "both SCLP and Phillips argued, and TNRCC agreed, that SCLP had operational control
of the boilers . . . in the netting exercise for the SCLP cogeneration facility in 1996. . . . Once that
operational control passed to SCLP, the boilers were no longer part of the Phillips site."

 Phillips requested review of the Commission's decision in a Travis County district
court, on the ground that the decision was arbitrary and unreasonable. See Tex. Health & Safety
Code Ann. § 382.032(a), (e) (West 2001); Tex. Water Code Ann. § 5.351 (West 2000). The district
court affirmed the Commission's decision, and it is from that judgment that Phillips appeals.


STANDARD OF REVIEW

 It is undisputed that the Commission's decision falls under the Texas Clean Air Act. 
See generally Tex. Health & Safety Code Ann. §§ 382.001-.216 (West 2001 & Supp. 2004) (Texas
Clean Air Act). In the appeal of a Commission decision governed by the act, other than cancellation
or suspension of a variance, we determine whether the decision is invalid, arbitrary, or unreasonable. 
See id. § 382.032(e). Whether the Commission failed to follow its own rules presents a question of
law. See BFI Waste Sys. of N. Am., Inc. v. Martinez Envtl. Group, 93 S.W.3d 570, 575 (Tex.
App.--Austin 2002, pet. denied). Therefore, we apply a de novo standard of review. See United
Copper Indus., Inc. v. Grissom, 17 S.W.3d 797, 801 (Tex. App.--Austin 2000, pet. dism'd).


ANALYSIS

 Phillips contends in its sole issue that the Commission acted arbitrarily and
unreasonably by considering factors outside of the purview of the MECT rules, specifically that the
Commission allocated the emissions allowances based on irrelevant policy considerations and
SCLP's "operational control," instead of Phillips's ownership, of the boilers. To put our
examination of the Commission's decision in the proper context, we must first discuss in further
detail SCLP's 1996 air quality permit application process, which figured prominently in the
Commission's decision to allocate the emissions allowances to SCLP.

 As part of SCLP's air permit application to build and operate the cogeneration
facility, SCLP wanted to avoid the costly NNSR procedures for a new "source" of emissions. Thus,
SCLP sought to employ "site-wide emissions netting" by offsetting increased emissions from the
new cogeneration units with decreased emissions from the existing boilers, with six "backup boilers"
and two "designated boilers" only intermittently fired. In this manner, the eight boilers and three
cogeneration units would be combined as an existing source for netting purposes. A source is "any
building, structure, facility, or installation which emits or may emit any air pollutant subject to
regulation under the Federal Clean Air Act." 30 Tex. Admin. Code § 116.12(18) (2003). Because
a "building, structure, facility, or installation" under the NNSR rules had to be "under the control of
the same person (or persons under common control)," id. § 116.12(4) (2003), the Commission
sought confirmation that SCLP would control the emissions. SCLP then included in its application
a copy of its agreement with Phillips, which contained several clauses giving SCLP authority over
the boilers, including the following:


5(c) Phillips shall provide the Partnership rights to, and control over emissions
from the Backup Boilers, including the Partnership's right to direct
operation of the Backup Boilers to assure compliance with any air permit
or other requirement relating to emissions from the Project.


* * * *


7.8(b) The Partnership shall have the right to control the operation of all the
Backup Boilers and direct the firing of the Designated Boilers.


* * * *


7.15(b) Phillips shall maintain, and . . . operate the Backup Boilers. If the
Partnership has obtained an air permit . . ., such operation shall be on behalf
of the Partnership and subject to the Partnership's direction of the
designated Boilers and control of the backup Boilers.



 The Commission responded to SCLP that it considered the application to be deficient
because the agreement did not sufficiently represent that "SCLP will maintain ultimate operational
control over the referenced boilers." The Commission went on to state that "[t]his control criterion
must clearly be documented in the permit application if the boilers are to be included in site-wide
emissions netting." Phillips responded that if the Commission added special conditions in the
permit, including a clause that the permit regulates the eight boilers only by limiting their emissions,
"during the term of the permit, and as long as emissions from the standby boilers are limited by the
permit, Phillips agrees that it has no authority independent of the Partnership's authority under the
permit, to cause emissions from the boilers." The Commission, after determining in an internal
memo that it was "satisfied that the partnership has sufficient control over the facilities included in
[the] permit application," issued the air quality permit for the cogeneration facility to SCLP in
September 1996.

 In December 2000, the Commission created the MECT program to reduce NOx
emissions in the Houston-Galveston area. See 30 Tex. Admin. Code §§ 101.350-.363. As part of
the program, owners or operators of facilities in operation before January 1, 1997, and with a
threshold level of emissions, were required to report their level of emissions averaged over 1997
through 1999. Id. §§ 101.351, .360(a)(1). The Commission would then allocate emissions
allowances and deposit them into compliance accounts for the facilities. Id. § 101.353. The
allowances were to shrink over time to reduce emissions. The emissions allowances have economic
value because they can be traded or sold. Id. § 101.356.

 In June 2001, SCLP and Phillips both filed applications for emissions allowances,
SCLP for the cogeneration facility and Phillips for the refinery. SCLP asserted its entitlement to the
allocations for the boilers because (i) Phillips represented in 1996 that SCLP had control of the
boilers; (ii) the boilers were included in SCLP's air quality permit; and (iii) the boilers were
transferred to SCLP's emissions inventory account in 1999. Phillips, in a letter accompanying its
application, stated that it was also claiming the allowances for the boilers and that the matter was in
dispute.

 After the Commission allocated the emissions allowances for the boilers to SCLP,
Phillips requested reconsideration of the decision. Phillips asserted that "[a]s owner, Phillips is
clearly a proper person to receive the allowances." Phillips further contended that SCLP could not
be the operator of the six boilers that were shut down and, as to the other two boilers, Phillips had
the "better claim" because it ceded operational control to SCLP only for the purposes of site-wide
emissions netting, not for allocation of emissions allowances. SCLP responded that Phillips's
ownership of the boilers was irrelevant because the Commission had to deposit the emissions
allowances into the account for a "site." Id. § 101.350(1).

 The definition of "site," under the MECT program, is the "total of all stationary
sources located on one or more contiguous or adjacent properties, which are under common control
of the same person." Id. §§ 101.350(13); 122.10 (2003). In its letter responding to Phillips's request
for reconsideration, the Commission determined that it was proper to allocate the emissions
allowances to SCLP because "[a]s determined during the netting exercise in 1996, the boilers and
the cogeneration facility are under the common control of SCLP and therefore represent a 'site'
under both the netting rules and the emissions cap and trade rules."

 We now turn to an examination of the Commission's decision. This requires us to
examine the applicable rules and determine whether the Commission acted outside of its authority. 
We construe the text of an administrative rule under the same principles as if it were a statute. Texas
Gen. Indem. Co. v. Texas Workers' Comp. Comm'n, 36 S.W.3d 635, 641 (Tex. App.--Austin 2000,
no pet.). We bear in mind that an administrative agency has the power to interpret its own rules, and
its interpretation is entitled to great weight and deference. Id. The agency's construction of its rule
is controlling unless it is plainly erroneous or inconsistent. Id.

 "When the construction of an administrative regulation rather than a statute is in
issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 17 (1965). This is
particularly true when the rule involves complex subject matter. See Equitable Trust Co. v. Finance
Comm'n, 99 S.W.3d 384, 387 (Tex. App.--Austin 2003, no pet.). We recognize that the legislature
intends an agency created to centralize expertise in a certain regulatory area "be given a large degree
of latitude in the methods it uses to accomplish its regulatory function." Reliant Energy, Inc. v.
Public Util. Comm'n, 62 S.W.3d 833, 838 (Tex. App.--Austin 2001, no pet.) (citing State v. Public
Util. Comm'n, 883 S.W.2d 190, 197 (Tex. 1994)).

 Here, because the MECT rules do not give guidance to the Commission when it has
to decide between competing applications for emissions allowances, if there is room for a policy
determination in the rule, we will defer to the agency's interpretation unless it is plainly erroneous
or inconsistent with the language of the rule. H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.,
36 S.W.3d 597, 604 (Tex. App.--Austin 2000, pet. denied). Our task is to determine whether an
agency's decision is based on a permissible interpretation of its statutory scheme. See Chevron,
U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). Because the interpretation
represents the view of the regulatory body that drafted and administers the rule, the agency
interpretation, if reasonable, becomes a part of the rule itself. See McMillan v. Texas Natural Res.
Conservation Comm'n, 983 S.W.2d 359, 362 (Tex. App.--Austin 1998, pet. denied).

 Phillips contends that the Commission's decision was in error because the
Commission considered "operational control" and policy concerns, neither of which are to be found
in the text of the rules governing the MECT program. Even if "operational control" is relevant,
Phillips argues, the Commission gave undue weight to that factor and failed to consider the most
relevant factor: Phillips's ownership of the boilers. Phillips further asserts that because the MECT
program is an entirely different regulatory program than the air quality permit program, the
Commission should not have considered SCLP's operational control of the boilers for permitting
purposes. But the Commission confirmed at oral argument that the Texas Clean Air Act governs
both programs. We agree with the Commission that, as a policy matter, viewing two regulatory
schemes that fall under the umbrella of the same act in isolation from each other would be
unworkable.

 In essence, Phillips asks that only its ownership and ability to "flip the switches" of
the boilers be taken into account, and in turn we should ignore the fact that SCLP, Phillips, and the
Commission agreed in 1996 that the boilers fell under SCLP's control for the purposes of the air
quality permit. To be able to include the boilers in SCLP's source for netting purposes, the
Commission needed assurance that SCLP controlled not only the new cogeneration units but also
the existing boilers. A "source" under the NNSR rules is "[a]ny building, structure, facility, or
installation which emits or may emit any air pollutant subject to regulation under the Federal Clean
Air Act." 30 Tex. Admin. Code § 116.12(18). A "building, structure, facility, or installation" is "all
of the pollutant-emitting activities which belong to the same industrial grouping, are located in one
or more contiguous or adjacent properties, and are under the control of the same person (or persons
under common control)." Id. § 116.12(4) (emphasis added). Once the Commission received the
assurance that SCLP controlled the boilers, the Commission issued the air permit to SCLP. From
then on, it was SCLP, not Phillips, that had the primary responsibility of operating the boilers in
compliance with Commission regulations. Phillips agreed at oral argument, in fact, that if there were
a change in operational status of the boilers under the air quality permit, SCLP, not Phillips, would
apply to the Commission for the change.

 Under the air quality permitting rules, the boilers were a part of SCLP's source. 
Under the MECT rules, to obtain the allowances, the "owner or operator of a facility," which is a
subset of a source under the NNSR rules, had to certify the level of activity for the boilers during the
years 1997 to 1999. Id. § 101.360(a). The Commission would then deposit the allowances into a
compliance account, "where allowances held by a facility or multiple facilities at a single site are
recorded." Id. § 101.350(7) (emphasis added). A "site" under the MECT rules has a very similar
definition to a "source" under the air quality permit rules: "the total of all stationary sources located
on one or more contiguous or adjacent properties, which are under the control of the same person
(or persons under common control)." Compare id. § 122.10(27), with § 116.12(4), (18).

 The Commission agreed at oral argument that the term "operational control" does not
appear in the MECT regulations, but the Commission's decision did not hinge solely on SCLP's
"operational control." The relevant inquiry was: if the boilers were part of SCLP's source under the
air quality regulations, were the boilers also a part of SCLP's site, as defined almost identically to
source, under the MECT regulations? Because the answer to that inquiry is yes, and because the
Commission is entitled to look to one entity for permitting purposes, it follows that the Commission
allocated the emissions allowances to SCLP. And, in any event, we view the Commission's
employment of the term "operational control" as a reasonable interpretation of its rules, given that
the definitions of both source under the NNSR rules and site under the MECT rules contain the
phrase "under the control of the same person." Thus, the Commission's decision was reasonable.

 Phillips argues that we should not defer to the Commission's decision because it
involves no special expertise simply to decide between the terms "owner" and "operator." We
disagree with Phillips's characterization of the factors that the Commission considered. The
Commission's determination instead involved construction of complex air quality and MECT
regulations, and we defer to the Commission's interpretation of the interplay of these technical rules. 
See Reliant Energy, 62 S.W.3d at 838. We overrule Phillips's issue and affirm the judgment of the
district court affirming the Commission's decision.


CONCLUSION

 When deciding between competing applications from Phillips and SCLP for NOx
emissions allowances for eight boilers, the Commission had to determine whose "site" contained the
boilers under the MECT regulations. In turn, the Commission necessarily examined the history of
whose "source" contained the boilers for air quality permitting purposes. Because the record reflects
that the boilers were part of SCLP's source under the NNSR regulations and its similarly defined site
under the MECT regulations, we hold that the Commission's decision to allocate the NOx emissions
allowances to SCLP was reasonable. Accordingly, we affirm the judgment of the district court
affirming the Commission's decision.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: November 20, 2003
1. In the underlying action, the name of the regulatory agency was the Texas Natural Resource
Conservation Commission ("TNRCC"). By statute effective September 1, 2001, the legislature
changed the name of the TNRCC to the Texas Commission on Environmental Quality, to be
effective January 1, 2004. The statute granted the TNRCC authority to adopt a timetable for phasing
in the change of the agency's name, so that until January 1, 2004, the agency may perform any act
authorized by law under either title. See Act of April 20, 2001, 77th Leg., R.S., ch. 965, § 18.01,
2001 Tex. Gen. Laws 1985. On September 1, 2002, the agency began using its new name, while
continuing to recognize the former. In this opinion, we will refer to the agency as the Commission.
2. "Cogeneration involves the simultaneous production of electrical power and thermal
energy, such as heat or steam, usually at an industrial site." Public Util. Comm'n v. Gulf States Utils.
Co., 809 S.W.2d 201, 203 (Tex. 1991) (citing Federal Energy Regulatory Comm'n v. Mississippi,
456 U.S. 742, 750 & n.11 (1982)).