# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-01-00195-CV

---

**Reliant Energy, Incorporated, Appellant**

**v.**

**Public Utility Commission of Texas; Office of Public Utility Counsel; and Steering Committees for the Cities Served by TXU Electric and Central Power and Light Company, Appellees**

---

### DIRECT APPEAL FROM PUBLIC UTILITY COMMISSION OF TEXAS

---

In this direct appeal, we must determine whether the Public Utility Commission of Texas (the "Commission") erred in promulgating price-to-beat rules that fail to ensure an initial fuel factor above market costs. Reliant Energy, Incorporated ("Reliant") brings this suit challenging the validity of these rules. Because the Commission acted within its authorized powers, we uphold the price-to-beat regulations as enacted.

### BACKGROUND

In 1999, the Texas Legislature amended the Public Utility Regulatory Act ("PURA") and enacted Chapter 39 "to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry."[1] Tex. Util. Code Ann. § 39.001(a) (West. Supp.

---

[1] Pursuant to this goal, the Legislature also amended section 11.002 to provide the Public Utility Commission of Texas with "authority to make and enforce rules necessary to protect customers . . . consistent with the public interest." Tex. Util. Code Ann. § 11.002(c) (West Supp. 2001).

2001). As part of the utility industry deregulation, the Legislature created a statutory scheme whereby the regulated utility industry would be separated or "unbundled" into three distinct entities: (1) power generation companies; (2) retail electric providers ("REPs"); and (3) transmission and distribution utilities. *Id.* § 39.051. Once the statute goes into effect, electric providers formerly affiliated with regulated utilities will be required to provide electricity to residential and small commercial customers at a rate of six percent less than the rate in effect on January 1, 1999, adjusted to reflect the fuel factor as determined by the Commission.[2] *Id.* §§ 39.202, .406. This price is referred to as the "price-to-beat."[3] *Id.* § 39.202. In enacting the price-to-beat statute, the Legislature intended for new REPs not affiliated with the regulated utility industry to enter the market and compete for customers with affiliated REPs, those that were formerly part of the bundled utility companies.

The Commission was mandated to effectuate an across the board six percent reduction to the base rate portion of the price-to-beat. *Id.* § 39.202(b). As part of the goal to promote competition, the Commission was given the express authority to make adjustments to the fuel factor portion of the price-to-beat. *Id.* Once established, the price-to-beat is to remain in effect for five

---

[2] "Fuel factor" is a term of art that is not statutorily defined. However, the Commission has prescribed to it a particular meaning in its substantive rules. *See* Tex. Gov't Code Ann. § 311.011 (West 1998); P.U.C. Subst. R. 25.237. Rule 25.41(g) mandates utilities to utilize substantive rule 25.237, its existing fuel factor rule, to set the initial price-to-beat fuel factor. *See* P.U.C. Subst. R. 25.237(c) (requiring utilities to prove that the expenses to be recovered through the fuel factor are reasonable estimates of their eligible fuel expenses during the period the factor is to be in effect).

[3] The price-to-beat is comprised of two components, the base rate and the fuel factor rate, and is defined as the cost at which an affiliated retail electric provider must make electricity available to residential and small commercial customers on a bundled basis. Tex. Util. Code Ann. 39.202(a) (West Supp. 2001). Bundled basis refers to the rates charged before deregulation.

2

years, unless the affiliated REP loses forty percent of its customers.[4] *Id.* § 39.202(a), (e). In determining whether the forty percent threshold has been met, the Commission excludes customers that are dropped by the affiliated REP to a provider of last resort ("POLR"). P.U.C. Subst. R. 25.41 § (i)(1)(A)-(B), (i)(2). By statute, POLRs are required to offer standard retail service packages for certain customers, as designated by the Commission, at a fixed, nondiscountable rate. Tex. Util. Code Ann. § 39.106(b).

## DISCUSSION

In three issues, Reliant challenges the Commission's scope of authority under PURA, both express and implied. Reliant first contends that PURA requires the Commission to implement, as part of the Legislative scheme to ensure a competitive market after deregulation, an initial price-to-beat fuel factor above market costs so as to secure immediate profits for new entrants into the retail electricity market. Reliant also contests the validity of the Commission's decision, when evaluating whether incumbent utility providers have lost forty percent of their residential and small commercial customers, to exclude from market share calculations customers served by a POLR. Finally, Reliant contends that rule 25.41, as promulgated by the Commission, violates the reasoned justification requirement of Texas Government Code section 2001.033. *See* Tex. Gov't Code Ann. § 2001.033 (West 2000).

---

[4] In determining whether a REP has lost forty percent of its customer base, the Commission will consider whether the REP can show that the electric power consumption of the relevant customer group served by nonaffiliated REPs meets or exceeds forty percent of the total number of kilowatt-hours consumed by residential customers and forty percent of the difference between the total number of kilowatt-hours consumed by small commercial customers served by the affiliated electric utility during the calendar year 2000 minus the aggregated load served by the affiliated REP. Tex. Util. Code Ann. § 39.202(e).

3

In determining whether the Commission's rule is valid, we must first ascertain whether the Legislature expressly gave the Commission the power to guarantee nonaffiliated retail electric providers an initial profit. *See Public Util. Comm'n v. City Public Serv. Bd. of San Antonio*, 44 Sup. Ct. J. 1014, 2001 Tex. LEXIS 71, at *15 (Tex. June 28, 2001). If no express authority is set forth, we must then consider whether that power is reasonably necessary for the Commission to fulfill the express function and duties prescribed by the Legislature. *Id.* Where such authority exists, a rule need only be based on a legitimate position of the agency to be upheld. *Chrysler Motors Corp. v. Texas Motor Vehicle Comm'n*, 846 S.W.2d 139, 142 (Tex. App.—Austin 1993, no writ) (citing *Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 756 (Tex. 1982)).

### Administrative Rule Making

Reliant contends that the Commission's substantive rule 25.41 is void because the Commission failed to include in it any mechanism to guarantee initial headroom.[5] This omission, argues Reliant, invalidates the rule because a rule that does not ensure sufficient initial headroom "fails to accomplish the legislative goal of promoting competition." State administrative agencies have only those powers expressly conferred upon them by the Legislature. *City Public Serv. Bd. of San Antonio*, 2001 Tex. LEXIS 71, at *15 (citing *Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995); *State v. Public Util. Comm'n*, 883 S.W.2d 190, 194 (Tex. 1994)). But an agency may also have implied powers—those that are reasonably necessary to carry out the express responsibilities given to it by the Legislature. *Id.* (citing *GTE-Southwest*, 901 S.W.2d at 407).

---

[5] "Headroom" refers to the margin between the price-to-beat and the new retailer's costs of providing electricity.

4

However, the law prohibits agencies from exercising what is effectively a new power, or a power contradictory to the statute, based merely on a claim that the power is expedient for administrative purposes. *Id.* (citing *GTE-Southwest*, 901 S.W.2d at 407 (quoting *Sexton v. Mt. Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137-38 (Tex. App.—Austin 1986, writ ref'd n.r.e.))).

Here, Texas Utility Code section 39.202 dictates how the Commission is to determine the price-to-beat. *See* Tex. Util. Code Ann. § 39.202(a), (b). The statute requires the Commission to set the price-to-beat at a rate "six percent less than the affiliated electric utility's corresponding average residential and small commercial rates, on a bundled basis, that were in effect on January 1, 1999, adjusted to reflect the fuel factor," as determined by the Commission. *Id.* § 39.202(a). Because there is nothing in the statutory language pertaining to headroom, we must look to the entire statutory scheme to determine whether the Commission was required to consider headroom in setting the initial price-to-beat. *See State v. Public Util. Comm'n*, 883 S.W.2d at 196.

In ascertaining the scope of an agency's authority, we give great weight to the contemporaneous construction of a statute by the administrative agency charged with its enforcement. *Id.* at 197 (citing *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994); *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)). We recognize that the Legislature intends an agency created to centralize expertise in a certain regulatory area "be given a large degree of latitude in the methods it uses to accomplish its regulatory function." *Id.*

According to the Commission, rule 25.41 reflects a reasonable balance between the competing interests of REPs and customers—namely, fostering competition while simultaneously providing customers a prompt reduction from regulated rates. Reliant does not contest the Commission's power to establish the initial price-to-beat. Instead, Reliant contends that the

Commission was *required* to include in rule 25.41 a mechanism guaranteeing that the price-to-beat would be above market cost and that, in failing to do so, it ignored the legislative goals underlying PURA and deregulation—establishing a competitive electricity market.

PURA encompasses competing policy considerations: electric consumers' interest in lowering costs versus electric retailers' interest in establishing competition. This Court does not decide matters of policy. Our role is limited to evaluating whether the Commission acted contrary to the statute. Reliant argues that in setting the initial price-to-beat, "the Commission could have provided a mechanism that would have established an adequate margin between the price-to-beat and the market cost of power," yet "the final rule contained no provision ensuring adequate initial headroom." Reliant concedes that the Commission had the *authority* to set the initial price-to-beat. Although the Commission *could* ensure adequate initial headroom, nothing in the statute *requires* it to do so; neither can such a requirement be found upon examination of the entire statutory scheme. Therefore, we cannot say that the Commission erred by not including a provision guaranteeing new entrants adequate initial headroom to secure a profit. Accordingly, Reliant's first issue is overruled.

### Provider of Last Resort

Reliant next contends that, because the PURA provides no basis for excluding POLR customers from the target forty percent affiliated REP reduction rate calculation, rule 25.41 is invalid. Here, Reliant asserts that, to the extent the Commission exercised an implied power to insert a non-statutory exclusion in the rule, the Commission overstepped its authority. In deciding whether the Commission exceeded its authority, we ask if the rule is in harmony with the general statutory objectives. *Chrysler Motors Corp.*, 846 S.W.2d at 141. The stated purpose of PURA Chapter 39

6

is to facilitate the *transition* between the regulated and deregulated utility market. *See* Tex. Util. Code Ann. § 39.001(a).

Reliant argues that excluding POLR customers from the forty percent target calculation thwarts the overall intent of PURA section 39.202(e), which, Reliant asserts, "is simply to ensure that a threshold percentage of the residential and small commercial loads formerly served by integrated utilities is served by entities other than the affiliated REP before price-to-beat restrictions are lifted." The Commission responds by claiming that the POLR provision directly serves the legislative purpose of the statute by counting only those customers lost to new REPs through the competitive process.

In construing the Commission's authority, we must look to the statute as a whole, not section 39.202(e) in isolation. It is undisputed that the intent of PURA is to provide a smooth transition from a regulated utility industry to a deregulated one. We cannot require the Legislature to include every detail and anticipate all unforeseen circumstances in statutes delegating authority to the Commission. To do so would defeat the purpose of delegating legislative authority. *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex. 1992). One of the bill's sponsors, Representative Wolens, commented at the House floor discussion on May 20, 1999 that the deregulation statute is intended to give competitors an opportunity to enter and compete in the electricity market. He explained that the forty percent provision was to be used as a tool to ascertain market power: "We say that as a matter of market power, if the incumbent loses 40% of their customers, competition begins and then they can lower their price."

These comments bolster the Commission's argument that the forty percent provision was intended to be used as an indicator for a *functioning* competitive market. Excluding customers

7

served by a POLR is consistent with the overall legislative scheme of calibrating the competitive market place. A rule need only be based on a legitimate position of the agency to be upheld; it "need not be wise, desirable, or even necessary." *Chrysler Motors Corp.*, 846 S.W.2d at 142. Thus, to the extent that the Commission exercised an implied power in excluding POLRs from the threshold forty percent determination, we cannot say such action is incongruent with the legislative purpose of promoting competition. Therefore, we overrule Reliant's POLR issue.

***Reasoned Justification***

One of the stated purposes of the APA is to provide for public participation in the rulemaking process. *See* Tex. Gov't Code Ann. § 2001.001. Accordingly, sections 2001.021-.034 establish a system of informal or "notice-and-comment" rulemaking. *Id.* §§ 2001.021-.034; *see also Unified Loans, Inc. v. Pettijohn*, 955 S.W.2d 649, 651 (Tex. App.—Austin 1997, no pet.). In order to adopt a rule, an agency must provide: (1) public notice; (2) an opportunity for and full consideration of comments; and (3) a reasoned justification for the rule enacted. *See* Tex. Gov't Code Ann. §§ 2001.023, .029, .033 (West Supp. 2001); *see also McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854 (Tex. App.—Austin 1996, no writ).

Reliant does not take issue with whether the Commission satisfied the requirements that it provide public notice and an opportunity for comments before adopting the price-to-beat rules.[6] The controversy instead concerns whether the Commission provided a reasoned justification

---

[6] Proposed rule 25.41, relating to the price-to-beat, was published in the *Texas Register* on November 20, 2000. Initial comments on the rule were filed December 11, 2000 by approximately thirteen interested organizations. Reply comments were filed on January 2, 2001. The Commission held public hearings on proposed rule 25.41 on January 11th and 22nd, 2001. Representatives from approximately fifteen interested parties and organizations attended the January 11th hearing while

for rule 25.41. This is the first time that we have been explicitly called upon to construe the reasoned justification requirements since the 1999 amendments to the APA. After a careful review of the changes to section 2001.033, we conclude that the Legislature did not intend to effectuate a material change.

To satisfy the reasoned justification requirement, an agency's order adopting a rule must explain how and why the agency reached the conclusion it did. *See National Ass'n of Indep. Insurers v. Texas Dep't of Ins.*, 925 S.W.2d 667, 669 (Tex. 1996) ("NAII"). A reasoned justification must include: (1) a summary of comments the agency received from interested parties; (2) a summary of the factual basis for the rule; and (3) the reasons why the agency disagrees with a party's comments. Tex. Gov't Code Ann. § 2001.033(1); *see also Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n*, 911 S.W.2d 884, 886 (Tex. App.—Austin 1995, writ denied).

In addition to these three criteria, the agency must provide a reasoned justification for the rule as a whole. *See Texas Hosp. Ass'n*, 911 S.W.2d at 886 (citing *Railroad Comm'n v. Arco Oil & Gas Co.*, 876 S.W.2d 473, 492 (Tex. App.—Austin 1994, writ denied); *Chrysler Motors Corp.*, 846 S.W.2d at 143). By requiring an agency to expressly state a reasoned justification for a rule, the Legislature sought to bring the decisionmaking process into the open. *See Arco*, 876 S.W.2d at 480; *see also NAII*, 925 S.W.2d at 669 ("Requiring an agency to demonstrate a rational connection between the facts before it and the agency's rules promotes public accountability and facilitates judicial review.").

---

only about eight were present at the hearing on the 22nd. Reliant participated in both public hearings and the initial comment proceeding. The final order was issued March 20, 2001.

An agency rule not adopted in substantial compliance with the rulemaking provisions of the APA section is voidable. Tex. Gov't Code Ann. § 2001.035(a). The reasoned justification requirement imposed by section 2001.033 confines a reviewing court's inquiry to the face of the order finally adopting the rule. *See Arco*, 876 S.W.2d at 480 (citing Ron L. Beal, *The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of Legislating and Rulemaking in Texas*, 39 Baylor L. Rev. 597, 690 (1987)); *see also Methodist Hosps. v. Industrial Accident Bd.*, 798 S.W.2d 651, 659 (Tex. App.—Austin 1990, writ dism'd w.o.j.). In *Methodist Hospitals*, this Court held that the

> question of substantial compliance . . . is a question of law to be determined solely from the face of the [adopting] order . . . . So much is necessarily implied by the statute itself. Substantial compliance is not a question of fact, to be determined by evidence adduced subsequently in a reviewing court, concerning *whether* the agency had *unstated* factual bases for its rule or *unstated* reasons for disagreeing with party submissions and proposals, and *what these were in fact*, or whether any *stated* factual bases or reasons for disagreeing were *in fact* considered and accepted by the agency on *sufficient evidence*.

798 S.W.2d at 659 (emphasis in original).

Therefore, to substantially comply with the reasoned justification requirement, the four corners of the agency's final notice must present the agency's justification in a "relatively clear, precise, and logical fashion."[7] *Arco*, 876 S.W.2d at 492. Furthermore, an agency's order must

---

[7]  *See also* Ron L. Beal, *The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of Legislating and Rulemaking in Texas*, 39 Baylor L. Rev. 597, 688 (1987) ("[T]he test of substantial compliance should not allow an agency to 'fill in the blanks' with meaningless rhetoric and thereby frustrate the legislative intent of reasoned decision making. The legislative intent undisputably requires a focused analysis by the agency of all relevant factual, policy and legal issues resulting not only in a justification, but a reasoned justification of the rule.").

accomplish the legislative objectives underlying the reasoned justification requirement and come fairly within the character and scope of each of the statute's requirements in specific and unambiguous terms. *See NAII*, 925 S.W.2d at 669 (citing *Arco*, 876 S.W.2d at 491; *Methodist Hosps.*, 798 S.W.2d at 654). The essential legislative objective of the reasoned justification requirement is

> to give notice of the factual, policy, and legal basis for the rule, as adopted or construed by the agency, in light of all the evidence gathered by the agency and submitted by interested parties during the comment period. This overall objective can be broken down into two fundamental goals of the reasoned justification requirement: (1) to ensure the agency fully considered the comments submitted and (2) to provide the factual basis and rationality of the rule as determined by the agency.

*Arco*, 876 S.W.2d at 491.

We review a challenge to the reasoned justification requirement using an "arbitrary and capricious" standard, with no presumption that facts exist to support the agency's order. *See Texas Hosp. Ass'n*, 911 S.W.2d at 887; *see also Arco*, 876 S.W.2d at 490-91. In applying an arbitrary and capricious test to agency rulemaking, we examine whether the agency's explanation of the facts and policy concerns it relied on when it adopted the rule demonstrates that the agency considered all the factors relevant to the objectives of the agency's delegated rulemaking authority, and engaged in reasoned decisionmaking. *See Arco*, 876 S.W.2d at 491. An agency acts arbitrarily if in making a decision it commits any of the following errors: (1) omits from its consideration a factor that the Legislature intended the agency to consider in the circumstances; (2) includes in its consideration an irrelevant factor; or (3) reaches a completely unreasonable result after weighing only relevant factors. *Statewide Convoy Transps. Inc. v. Railroad Comm'n*, 753 S.W.2d 800, 804 (Tex.

11

App.—Austin 1988, no writ); *see also Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 756 (Tex. 1982) (stating a rule is arbitrary and capricious when it lacks a legitimate reason to support it).

As set out in the Utility Code, the Commission's statutory mandate is "to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry." Tex. Util. Code Ann. § 39.001. The Legislature delegated to the Commission the power to adopt rules pursuant to this mandate. *Id.* § 11.02(c). In particular, the Commission must set the price-to-beat by decreasing base rates by six percent and adjusting the fuel factor to account for changes in the market. *Id.* § 39.202. Thus, within the four corners of the Commission's order adopting the price-to-beat rules, we must be able to determine that the Commission considered and found facts to support its decision that the initial price-to-beat need not include sufficient headroom to ensure nonaffiliated REPs would realize a profit.

To determine whether the Commission's order adopting the price-to-beat rules satisfies the reasoned justification requirement of the APA, we consider each substantive element set out in the statute. *See* Tex. Gov't Code Ann. § 2001.033; *see also Methodist Hosps.*, 798 S.W.2d at 659. The first element is "a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption." *Id.* The Commission's order sets out expressly and at some length the information required by the first element. Because Reliant does not complain that the summary of comments is absent from the order; we need not consider this item further.

The crux of Reliant's challenge concerns the second and third elements of the reasoned justification requirement: "a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted" and "the reasons

12

why the agency disagrees with party submissions and proposals." *Id.* Reliant contends that the adopting order fails to explain why the Commission rejected proposed solutions that would have remedied the problem of inadequate headroom. In particular, Reliant argues that the order fails to demonstrate an adequate consideration of lack of an initial headroom amount that would ensure a profit margin and encourage competition. Reliant contends that the statements of justification in the adopting order are merely conclusory and do not substantially comply with the reasoned justification requirement of the APA. Reliant recognizes that the Commission did consider that the initial headroom might be below market value.[8] Reliant goes on to comment, however, that the "rule should have been drafted in a way that would have avoided this problem."

The order acknowledges that determining the appropriate mechanism to use in adjusting the fuel factor portion of the price-to-beat "was by far the most controversial aspect of" rule 25.41. The Commission urges that several portions of the order adopting the price-to-beat rule satisfy the reasoned justification requirement. Specifically, the order recognizes that the

> lack of headroom demonstrates that the economics of serving [price-to-beat] customers make[s] it unlikely that . . . customers will benefit from competition. It is illogical to remedy this problem by increasing the [price-to-beat] to a level that exceeds the rate that these customers would have paid with continued regulation in order that they can benefit from competition.

This language precisely states the reasons why the new rules were adopted, namely to ensure customers will realize a rate reduction after deregulation.

---

[8] In its brief, Reliant comments, "The Commission undoubtedly realized that the margin between an affiliated REP's commodity costs and its price-to-beat may be negative."

Additionally, the Commission points out that rule 25.41(g) authorizes the Commission to make fuel factor adjustments in three situations: (1) if the affiliated REP demonstrates that the existing fuel factor does not adequately reflect significant changes in the market price of natural gas and purchased energy; (2) upon a finding by the Commission that the affiliated REP will be unable to maintain its financial integrity; or (3) the Commission may adjust the price-to-beat under PURA section 39.262, the "true-up" provision. The Commission contends that these provisions justify its decision not to increase the initial headroom in the price-to-beat rule because they provide viable alternatives to setting an artificially high price-to-beat as a means of ensuring competition.

These comments provide a reasoned justification for the Commission's conclusion that the alternative mechanisms proposed in lieu of creating greater headroom are more efficacious to accomplish the dual legislative purpose of providing customer savings and encouraging retail competition. The Commission analyzed whether other measures would adequately ensure competition and its order explains why requiring sufficient initial headroom to ensure profitability is unnecessary to the legislative scheme of developing competition and protecting consumers. *See Methodist Hosps.*, 798 S.W.2d at 659. Thus, this portion of the rule satisfies the reasoned justification requirements.

Reliant next argues that the order fails to justify the rejection of an electricity commodity index requested by Reliant and other parties. The Commission argues that its responses to arguments made by interested parties fully explain the reasons it concluded that the rule as enacted adequately encourages competition. For example, in its order, the Commission explained:

> It is not appropriate to move to such an index until the stranded costs of the affiliated PGC are finalized as any stranded cost charges . . . will not be finalized until stranded

14

costs are finalized. At that time, if the price to beat for an affiliated REP is in danger of being below market because of high market prices for generation, the return of any excess mitigation, or negative stranded costs if the commission determines that it has the authority to require the return of negative stranded costs, can be used to address concerns about headroom and thereby mitigate the effects of high market prices on price to beat customers. Subsection (g)(1)(F) has been added to allow for this transition and prescribes these preconditions and the methods by which an affiliated REP must transition to the use of an electricity index.

Thus, the Commission was convinced that adequate safeguards exist for offsetting changes in market conditions so that the price-to-beat need not be adopted to the exclusion of all other remedies. These statements secure the legislative objectives that underlie the reasoned justification requirement. While the reasoned justification requirement does not demand that an agency provide detailed findings of fact and conclusions of law, *see Chrysler Motors Corp.*, 846 S.W.2d at 143, an agency must provide more than a general reference to statutory authority, *Arco*, 876 S.W.2d at 494; *see also* Beal, 45 Baylor L. Rev. at 33 ("Mere reiteration of the statutory language does not ensure that the agency relied on and informed interested parties of the underlying factual basis for the rule, according to the legislative objective."). Here, the Commission satisfied this burden, having noted in its order its reasons for disagreeing with the submissions and proposals it received.

Reliant's final contention is that, in rejecting a move to an electric commodity index, the Commission failed to justify its disregard for the balanced plan the Legislature crafted to stimulate competition in the period before the 2004 true-up and to protect affiliated REPs from devastating losses. This argument is inextricably linked to the Commission's rejection of an electricity index. In its order, the Commission explained that it disagreed with Reliant's position because after "2002, the market price of [electricity] generation will likely be set by gas-fired generation, and as such, it is appropriate to apply the changes in the market price of natural gas and purchased energy to the entire

fuel factor in order to maintain the level of headroom in the price to beat." The Commission's reasons for its rejection of an electric commodity index is directly responsive to Reliant's expressed concerns and satisfies the reasoned justification requirement.

## CONCLUSION

Having overruled Reliant's three issues, we sustain the validity of rule 25.41 as enacted by the Commission.

—

Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: November 15, 2001

Publish

16