# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00748-CV

**Edward Lambright, Richard Moore, Eric Kimball, Terry Ricks, and
Calhoun County Shrimpers, Appellants**

**v.**

**Texas Parks and Wildlife Department and Texas Parks and
Wildlife Commission, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. GN0-03351, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

In this appeal, we consider the validity of one newly adopted rule and two amended rules promulgated by appellees, Texas Parks and Wildlife Department and Texas Parks and Wildlife Commission (collectively, TPW).[1] Appellants Edward Lambright, Richard Moore, Eric Kimball, Terry Ricks, and the Calhoun County Shrimpers (collectively, the Shrimpers) sued to invalidate the rules. The parties filed cross motions for summary judgment and the court decided in favor of TPW and against the Shrimpers, who then brought this appeal. We will affirm the judgment of the district court.

---

[1] The Texas Parks and Wildlife Department is a state agency operating "under the policy direction of the Parks and Wildlife Commission." Tex. Parks & Wild. Code Ann. § 11.011 (West 2002).

## BACKGROUND

Appellants are Texas bay shrimpers licensed by TPW to catch shrimp along the Texas gulf coast. In 2000, TPW amended two existing rules and proposed one new rule shortening the fall shrimping season, expanding nursery areas closed to shrimping and requiring shrimpers to install "bycatch reduction devices" (BRDs) in their shrimp nets.[2] *See* 25 Tex. Reg. 6670-6686 (2000), *adopted* 25 Tex. Reg. 10157 (2000) (codified at 31 Tex. Admin. Code §§ 58.102(3), (16) (2002) (nursery areas); 58.160(e) (2002) (BRDs); 58.163(c)(1) (2002) (fall open season)).

TPW justified the restrictions on bay shrimping on several bases. It noted that shrimp were "a critical part of healthy coastal ecosystems in Texas [and] . . . an important food source for game fish that support a $2 billion sport fishery." 25 Tex. Reg. 6670. "Three principal species, brown shrimp, pink shrimp, and white shrimp, are the basis for Texas' most valuable commercial fishery," and "a decline of 27 years or longer of catch per unit effort (CPUE)[3] in the shrimp fishery indicates that biological overfishing of shrimp populations is occurring." *Id.* The legislature directed TPW to achieve optimum yield, that is, the amount of shrimp the shrimp fishery could produce on a continuing basis to gain maximum economic benefits, controlling for relevant social and ecological factors. *Id.* If shrimp populations are overfished, optimum yield cannot be achieved. *Id.* TPW's 1989 Shrimp Fishery Management Plan documented the overfishing of Texas shrimp populations;

_____

[2] "Bycatch" refers to unwanted catch of non-target organisms. A bycatch reduction device is a device installed in a shrimp net that allows other species to escape the net without injury. *See* 25 Tex. Reg. 10172-73 (October 6, 2000).

[3] Catch per unit effort (CPUE) measures the amount of shrimp caught for a given amount of energy expended. A CPUE decline means fewer shrimp are caught given the same amount of effort. 25 Tex. Reg. 10164.

increased effort only resulted in the harvest of more shrimp at smaller sizes, giving rise to concerns for the long-term viability of shrimp stocks. *Id.*

Beginning in January of 1999, TPW conducted an 18-month-long "detailed re-examination" of the long-term trends in the shrimp fishery and determined that overfishing impacts all three shrimp species and that the harvest of juvenile shrimp had increased by over 400 percent since 1972. *Id.* According to TPW, the National Fisheries Service concurred with its conclusion that the shrimp industry in Texas suffered "growth overfishing," which meant that shrimp were harvested before they could mature, reducing the potential for escapement to the gulf to spawn. *Id.* at 6670-71. "The resulting reduction of adult shrimp entering the spawning group in the Gulf threatens the sustainability of the shrimp fishery" and could lead to more serious biological problems. *Id.* at 6671. TPW based its proposed rules upon these investigations and findings. *Id.* at 6670.

After TPW adopted the rules, the Shrimpers sued for declaratory relief, *see* Tex. Gov't Code Ann. § 2001.038 (West 2000), seeking a declaration that: (1) the rules were invalid because they were adopted without a reasoned justification, *id.* § 2001.033, .035, (2) the rules were invalid because TPW failed to conduct a regulatory-impact analysis, *id.* § 2001.0225(a)(4), (3) the rules were inconsistent with TPW's enabling statute, Tex. Parks & Wild. Code Ann. § 77.007 (West 2002), and (4) the rules deprived them of due process. They also sought to enjoin enforcement of the rules. *See* Tex. Civ. Prac. & Rem. Code Ann § 65.011 (West 1997).

TPW twice moved for partial summary judgment. *See* Tex. R. Civ. P. 166a(c). The district court granted both the first motion, which addressed the Shrimpers' first three claims without

3

specifying grounds, and the second motion, which addressed the fourth claim. The district court also denied the Shrimpers' two motions for summary judgment based on the claim of lack of reasoned justification and based on the claim that TPW was arbitrary and capricious in making these rules. The Shrimpers appeal the denial of their motions for summary judgment in two issues. They contend that TPW adopted its rules without a reasoned justification because (1) it did not comply with section 77.007(f) of the parks and wildlife code, which prohibits TPW from promulgating rules that are inconsistent with TPW's fish management plan, and (2) it did not comply with section 77.007(b) of the parks and wildlife code, which sets out a list of factors TPW must consider when promulgating rules governing shrimping.

## DISCUSSION

**Standard of review**

To be entitled to summary judgment, the movant must show that it is entitled to judgment as a matter of law. *Sergeant Enters., Inc. v. Strayhorn*, 112 S.W.3d 241, 244 (Tex. App.—Austin 2003, no pet.). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all the questions presented and render the judgment the trial court should have rendered. *Commissioners Ct. v. Agan,* 940 S.W.2d 77, 81 (Tex. 1997); *Lower Laguna Madre Found. v. Texas Natural Res. Conservation Comm'n*, 4 S.W.3d 419, 423 (Tex. App.—Austin 1999, no pet.). We review the granting of a summary judgment *de novo. Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). Because the district court did not state the basis for granting summary judgment in favor of TPW, the Shrimpers must negate all grounds that support the judgment. *Farm*

4

*Fire & Cas. Co. v. S.S. & G.W.*, 858 S.W.2d 374, 381 (Tex.1993); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989). If the appellants fail to negate each ground on which the judgment may have been rendered, we must uphold the summary judgment. *Carr*, 776 S.W.2d at 569.

**Reasoned justification**

The Administrative Procedures Act provides for "notice-and-comment" rulemaking by agencies. *See* Tex. Gov't Code Ann. §§ 2001.001, .021, .034, .037 (West 2000 & Supp. 2004-05). In order to adopt a rule under that system, an agency must provide: (1) public notice; (2) an opportunity for and full consideration of comments; and (3) a reasoned justification for the rule. *See id*. §§ 2001.023, .029, .033; *McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854 (Tex. App.—Austin 1996, no writ).

The Shrimpers first argue that the rules lack a reasoned justification because TPW failed to consider factors that the legislature intended it to consider when it shortened the fall shrimping season, expanded nursery and bait bays closed to shrimpers, and required them to install and use BRDs. *See* Tex. Parks & Wild. Code Ann. § 77.007(b) (West 2002).[4]

---

[4] Section 77.007(b) sets out six factors the legislature intended for TPW to consider when adopting a rule:

    (1)  measures to prevent overfishing while achieving, on a continuing basis, the optimum yield for the fishery;

    (2)  measures based on the best scientific information available;

    (3)  measures to manage shrimp throughout their range;

    (4)  measures, where practicable, that will promote efficiency in utilizing shrimp resources, except that economic allocation may not be the sole purpose of

5

To satisfy the reasoned justification requirement, the order adopting the rules must explain how and why TPW reached its conclusion. *See* Tex. Gov't Code Ann. § 2001.033; *National Ass'n of Indep. Insurers v. Texas Dep't of Ins.*, 925 S.W.2d 667, 669 (Tex. 1996). A reviewing court must confine its search for a reasoned justification to the four corners of the order finally adopting the rule, and the agency must provide a reasoned justification for the rule as a whole, not clause by clause. *Reliant Energy, Inc. v. Public Util. Comm'n of Tex.*, 62 S.W.3d 833, 840 (Tex. App.—Austin 2001, no pet.). That reasoned justification must include (1) a summary of the comments from interested persons; (2) a summary of the factual basis for the rule; and (3) the reasons why TPW disagreed with a party's comments. *See* Tex. Gov't Code Ann. § 2001.033; *Lower Laguna Madre Found.*, 4 S.W.3d at 425. An order demonstrating "in a relatively clear and logical fashion that the rule is a reasonable means to a logical objective" substantially complies with the reasoned justification requirement. Tex. Gov't Code Ann. § 2001.035(c) (2000). The order must accomplish the legislative objectives underlying the reasoned justification requirement: to give notice of factual, policy, and legal bases for the rule as adopted by the agency, in light of all the evidence it gathered. *Reliant Energy, Inc.*, 62 S.W.3d at 841. A rule not adopted in substantial compliance with the reasoned justification requirement is voidable. Tex. Gov't Code Ann. § 2001.035(a).

---

the measures;

(5) measures, where practicable, that will minimize cost and avoid unnecessary duplication in their administration;  and

(6) measures which will enhance enforcement.

Tex. Parks & Wild. Code Ann. § 77.007(b) (West 2002).

6

We review a challenge to the reasoned justification requirement using an "arbitrary and capricious" standard and not presuming that facts exist to support the agency's order. *Reliant Energy, Inc.*, 62 S.W.3d at 841 (citing *Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n*, 911 S.W.2d 884, 887 (Tex. App.—Austin 1995, writ denied)). In applying the arbitrary and capricious test to agency rulemaking, we examine whether the agency's explanation of the facts and policy concerns it relied on in adopting the rule demonstrates that the agency considered all relevant factors and engaged in reasoned decisionmaking. *Id.* (citing *Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 491 (Tex. App.—Austin 1994, writ denied)). An agency acts arbitrarily if in making a decision it: (1) omits from its consideration a factor that the legislature intended the agency to consider in the circumstances; (2) includes in its consideration an irrelevant factor; or (3) reaches a completely unreasonable result after weighing only relevant factors. *Id.* (citing *Statewide Convoy Transp. Inc. v. Railroad Comm'n*, 753 S.W.2d 800, 804 (Tex. App.—Austin 1988, no writ)).

### *Measures based on the best scientific evidence available*

The Shrimpers argue that TPW omitted from its consideration factors that the legislature intended for TPW to consider. They contend that rule 58.163(c), shortening the shrimping season by fifteen days in December; rules 58.102(3)(A) & (B), (16)(A) & (B), increasing nursery closures and bait bay designations; and rule 58.160(e), requiring BRDs, do not comply with section 77.007(b)(2) because TPW did not consider the best scientific data available before making these changes. *See* Tex. Parks & Wild. Code Ann. § 77.007(b)(2).

We disagree. The record supports TPW's argument that it based the rules on the best scientific information available. The text of the rules specifically stated that the purpose of the

7

amendments was to address the overfishing of all shrimp populations and cited fifty-seven treatises, studies, and other data in support of the rules. 25 Tex. Reg. 10159-61.

The Shrimpers argue that there is no data showing an actual decline in the shrimp population, that the bay shrimp fishery is healthy and not in danger, and that, because this rule targets growth overfishing, a closure in December, when the white shrimp in the bays are mature, is irrational and designed to regulate the bay shrimpers out of existence.[5]

TPW explained clearly and logically how the rules were a reasonable means to its objective of preserving the shrimp fishery, using the best scientific evidence available. It noted the long-term downward trend in the size of harvested shrimp and the long-term downward trend in CPUE.[6] 25 Tex. Reg. 10159-61. It considered submissions by Dr. Adolfo Gracia, Director, Instituto de Ciencias del Mar y Limnologia, Universidad Nacional Autonoma de Mexico, an expert who

---

[5] Part of the Shrimpers' argument centers on TPW's alleged failure to relate the rules individually to the life cycle of white shrimp. TPW claims that "growth overfishing," or premature harvesting of small, young shrimp, necessitates a shortened season although mature white shrimp are the only shrimp migrating from the bays to the gulf during December. The Shrimpers argue that TPW has only shown that brown shrimp suffer growth overfishing, that "recruitment overfishing," which impairs the stock by depleting the numbers of spawning shrimp to levels where numbers of offspring decline, must be the justification for any closure at the end of the shrimp maturity cycle and that TPW had failed to connect its rules to any risk of overfishing of white shrimp. However, TWP considered white shrimps' cycles. It cited an expert assessment that brown and white shrimp were experiencing growth overfishing and noted that shortening the shrimping seasons would allow more shrimp, including white shrimp, to escape to the gulf to spawn and that continued high rates of fishing mortality, including that occurring at the end of the season, could reduce spawning stock size to levels risking recruitment overfishing. 25 Tex. Reg. 10158. According to TPW, because all three species of bay shrimp can be harvested during the same season and even by the same boat, the rules were directed toward the fleet and were not species-specific. *Id*. at 10164.

[6] The Shrimpers argue that CPUE is an economic concept, not a scientific principle. However, the CPUE data can also indicate the biological health of a fishery. *See* 25 Tex. Reg. 10159-61.

8

explained the connection between growth and recruitment overfishing and the collapse of fisheries in the Gulf of Mexico in white and pink shrimp populations. *Id*. at 10159. He demonstrated that increased shrimping of both juvenile and adult shrimp had caused shrimp fishery collapses in Mexico. *Id*. The National Marine Fisheries Service provided additional data and concurred that a precautionary approach was necessary. *Id*. Closing the bay earlier, TPW observed, would allow more mature shrimp to escape to spawn and prevent a reduction in adult spawners from threatening the sustainability of the shrimp fishery.[7] *Id*. at 10158. TPW relied on such information in setting the end of the season and in enlarging the areas prohibiting shrimping in order to limit the overfishing of shrimp.[8]

The Shrimpers protest that there is no scientific basis for the new designation of nursery areas and bait bays because there is no data indicating that such areas qualify as nurseries under TPW's Shrimp Fishery Management Plan's[9] (SFMP) use of the term "nursery" or that designation of additional nursery areas would achieve TPW's goal of promoting efficiency by reducing bycatch and habitat destruction. The SFMP Source Document uses the term "nursery" to describe an area less than 0.9 meters deep that has abundant detritus or vegetation.[10] The question

---

[7]  This proposition was based on data gathered in the bays by TPW monitoring efforts.

[8]  In proposing the amendment, TPW noted that the net effect of the changes to paragraphs (3) and (16) would be to "increase the amount of nursery area closed to shrimping from a previous total of 12% of the bay waters coastwide to 18%" and would "increase the bait bay area from a previous total of 35% of the bay waters to 39%." 25 Tex. Reg. 6673.

[9]  Terry J. Cody et al., Coastal Fisheries Branch, Texas Parks and Wildlife Dep't, Texas Shrimp Fishery Management Plan: Fishery Management Plan Series Number 2 (1989). (SFMP).

[10]  Terry J. Cody et al., Coastal Fisheries Branch, Texas Parks and Wildlife Dep't, Texas Shrimp Fishery Management Plan: Fishery Management Plan Series Number 2: Source Document

here is whether TPW used the best scientific evidence available to reach its decision designating additional nursery areas and closing them to shrimping. *See* Tex. Parks & Wild. Code Ann. § 77.007(b)(2). TPW need not prove that the closed areas are less than 0.9 meters deep and have detritus or vegetation in order to show a reasoned justification of its decision to close them as nurseries,[11] nor need it specifically quantify the reduction in bycatch and habitat destruction in order to show it considered the best scientific evidence available in deciding to designate new nursery areas.

TPW considered ample scientific data indicating that a reduction in shrimping activity in general would promote the health of the shrimp fishery by reducing long-term overfishing trends, as discussed above. Scientific data showing that shrimpers were catching more juvenile shrimp indicated overfishing. 25 Tex. Reg. 10158-59. Specifically, the expansion of nursery and bait bay areas was designed to address growth overfishing, defer harvest of smaller shrimp and allow them to mature, and protect the environment and biodiversity by reducing bycatch and habitat destruction, based on current nursery monitoring data. *Id*. at 10170. TPW relied on expert opinions from Dr. Gracia and other scientific reports in determining that extending the nurseries and bait bays would increase escapement and increase spawning potential. *Id*. at 10159. The data showed that closing nursery areas would allow more shrimp to grow and escape to spawn, and that the nursery designation would protect the habitat, shrimp, and other species. *See id*. at 10167. These rules were

7 (1989). (SFMP Source Document).

[11]  In fact, although current nursery areas are generally shallow with dense vegetation or detritus, the term is also used to describe protected bay areas where shrimping is prohibited in order to allow shrimp to mature before being caught. *See, e.g.*, 25 Tex. Reg. 10170.

designed to defer harvest of shrimp until they were more mature, creating a sustainable shrimp fishery by reversing the growth overfishing trend observable from the available data and preventing it from becoming a recruitment problem. *Id*. at 10164.

The Shrimpers also argue that TPW's proffered scientific justification of increasing efficiency in the use of shrimp resources by reducing bycatch of finfish and invertebrates is really a goal and not scientific data. *See* 25 Tex. Reg. 10159. TPW provided research and documentation that shrimping reduces biodiversity by altering the habitat and through bycatch, and it follows that a reduction in shrimping in certain areas would reduce its ill effects; "elimination of shrimping efforts in these areas should result in greater potential escapement of shrimp to the Gulf, elimination of bycatch in these areas, and elimination of trawling impacts on the nursery habitat." *Id.* at 10159-10161. Thus, TPW did not act arbitrarily by failing to base its nursery designations on the best scientific information available. *See Reliant Energy, Inc.*, 62 S.W.3d at 841.

The Shrimpers also argue that the BRD requirements were not based on the best scientific information available because BRDs are used to protect other species, not to reduce overfishing of shrimp. They contend that the rule is arbitrary and capricious because it is designed to protect other fish species from shrimp nets. They assert that it therefore does not comply with the requirement that TPW predicate the adoption of a rule only on the best scientific data available. Tex. Parks & Wild. Code Ann. § 77.007(b)(2). This is a non-sequitur. Although the BRDs are primarily intended to reduce bycatch and not the shrimp harvest, the record supports TPW's argument that it relied on the best scientific evidence available in determining whether to require BRDs.

11

Accordingly, TPW does not attempt to support this rule with scientific data connecting the necessity for BRDs with the preservation of shrimp, but instead argues that the effect of shrimping on other marine life is a valid consideration for TPW. We agree. In applying an "arbitrary and capricious" test to agency rulemaking, we examine whether the agency's explanation of the facts and policy concerns relied on in adopting the rule demonstrates that it considered all factors relevant to the objectives of the agency's delegated rulemaking authority and engaged in reasoned decision making. *ARCO Oil & Gas Co.*, 876 S.W.2d at 491.

TPW's enabling statute gives it regulatory power over "game, fish, oysters, and marine life." Tex. Parks & Wild. Code Ann. § 12.001 (West 2002).[12] Because TPW is authorized to regulate all aquatic life, its concern for the effect of shrimping on other aquatic life was properly addressed by rule. TPW noted that shrimping damages the habitat supporting other sea life, like turtles and finfish. 25 Tex. Reg. 10159. TPW's own tests and data as well as other expert studies indicated that on average four pounds of bycatch are landed with every pound of shrimp taken in the

---

[12] Chapter 77 requires TPW to study "the status of marine resources and habitats affected by shrimping" and consider measures that will "prevent overfishing while achieving, on a continuing basis, the optimum yield for the fishery," while promoting "efficiency in utilizing shrimp resources." Tex. Parks & Wild. Code Ann. § 77.005(a)(4) (West 2002). Chapter 61 authorizes TPW to "regulate the means, methods, and places in which it is lawful to hunt, take, or possess . . . aquatic animal life." *Id*. § 61.052 (West 2002). We construe the provisions of chapters 61 and 77 *in pari materia* to give full effect to the intent of the legislature. *Lenhard v. Butler*, 745 S.W.2d 101, 105 (Tex. App.—Fort Worth 1988, writ denied) (citing *Trinity Universal Ins. Co. v. McLaughlin*, 373 S.W.2d 66, 69 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.)); *see also* Norman J. Singer, Sutherland Statutory Construction §§ 77:1, 77:6 (6th ed. 2003) (noting that laws providing for conservation of natural resources should be liberally construed and that environmental statutes are to be read *in pari materia*).

bays[13] and that eighty-six percent of sea turtle mortalities attributed to humans are caused by shrimp trawling. *Id*. at 10159, 10160, 10162. The National Marine Fisheries Service recommends BRDs to reduce this wasted bycatch; BRD use is required in federal waters. *Id*. at 10162. Furthermore, in its rules TPW cited multiple studies explaining how BRDs reduce bycatch mortality and increase habitat biodiversity and complexity. *Id*. at 10159. There is no merit to the Shrimpers' argument that TPW neglected to examine the best scientific evidence available in determining that requiring BRDs was an appropriate response to a real problem in efficient utilization of shrimp resources.

TPW promulgated its rules shortening the fall season, expanding nursery areas and bait bays, and requiring BRDs based on its own research, numerous studies, and expert recommendations. We cannot say that TPW acted arbitrarily by neglecting to consider the best scientific evidence available in promulgating its rules. Given TPW's consideration of the scientific evidence, the challenged amendments constitute a reasonable means to a logical objective and TPW has therefore substantially complied with the reasoned justification requirement in this respect. *See* Tex. Gov't Code Ann. § 2001.035(c); *ARCO Oil & Gas Co.*, 876 S.W.2d at 491; *Reliant Energy, Inc.*, 62 S.W.3d at 841.

*Economic allocation and efficiency*

The Shrimpers also contend that rule 58.163(c) (shortening the fall open season) and rule 58.160(e) (requiring BRDs) lack a reasoned justification because both fail to comply with section 77.007(b)(4), which requires TPW to consider "measures, where practicable, that will

---

[13] This totals "about 2 billion organisms" captured but "discarded as bycatch each year during commercial bay shrimping activities." 25 Tex. Reg. 10159.

promote efficiency in utilizing shrimp resources, except that economic allocation may not be the sole purpose of the measures." Tex. Parks & Wild. Code Ann. 77.007(b)(4).

The shortened season, the Shrimpers argue, is pure economic allocation, which is prohibited by the code. *See id.* The Shrimpers reason that, because the shrimp fishery in the bay is healthy, this rule simply removes mature white shrimp from the nets of bay shrimpers and allows them to be caught by other shrimpers in the gulf. In short, they contend that TPW has singled out their industry for elimination and intends to regulate them out of business.

However, TPW regulates both the gulf shrimpers and bay shrimpers. *See, e.g.*, 25 Tex. Reg. 6683 (2000), *adopted* 25 Tex. Reg. 10157 (2000) (codified at 31 Tex. Admin. Code § 58.161(d)(4)) (changing last day of *gulf* fall shrimping season from December 15 to November 30). Further, TPW's rule amendments list several purposes for the rules other than economic allocation. As discussed in detail above, TPW included in its rules extensive discussions of overfishing, environmental concerns, and the long-term viability of the shrimp fishery and habitat. CPUE measurements and observations by TPW and others indicate that the shrimp fishery is at risk of collapse if current trends continue. *See, e.g.*, 25 Tex. Reg. 10158. The extended seasonal closure allows more shrimp to escape and spawn and is directed to prevent recruitment overfishing, not to favor gulf shrimpers over bay shrimpers. The reasoned justification TPW provided in the rules shows that economic allocation was not the sole purpose of these measures.

The Shrimpers claim that the BRD requirement also fails to satisfy section 77.007(b)(4) because TPW failed to demonstrate how BRDs promote efficiency in utilizing shrimp resources. TPW's response to the Shrimpers' comment, they argue, amounted to a mere conclusion

14

that BRDs would promote efficiency. To the contrary, the Texas Register reveals that TPW considered whether BRDs were an appropriate response to the staggering levels of bycatch and waste associated with shrimping efforts. *See*, *e.g.*, 25 Tex. Reg. 10159 (explaining how BRDs decrease wasted bycatch). TPW commented that BRDs have been shown to reduce fish mortality for recreationally caught fish, juvenile finfish and invertebrates, and to enhance the overall viability of the ecosystem. *Id*. at 10159. The measures were designed to increase efficiency by reducing bycatch while maintaining the shrimp catch within 3% of current levels. *Id*. at 10160. In explaining that bycatch presented a problem and how BRDs reduce bycatch, TPW demonstrated that it considered practicable measures to promote efficiency in utilizing shrimp resources and substantially complied with the reasoned justification requirement by considering the factors the legislature mandated. *See* Tex. Parks & Wild. Code Ann. 77.007(b)(4) (West 2002); *Reliant Energy, Inc.*, 62 S.W.3d at 841. The BRD requirement is a reasonable means to a logical objective. *See* Tex. Gov't Code Ann. §2001.035 (c).

We conclude that TPW provided a reasoned justification for its rule amendments and complied with the parks and wildlife code section 77.007(b).

**Shrimp Fishery Management Plan**

The Shrimpers next contend that the rules are inconsistent with the mandate of the Parks and Wildlife Department's fish management plan. *See* Tex. Parks & Wild. Code Ann. § 77.007(f). The parks and wildlife code gives TPW the authority to promulgate rules only after it has approved and adopted a fish management plan, and any rules it creates must be consistent with that plan. *Id*. We treat the Shrimpers' argument that the rules must be consistent with the SFMP as

15

a protest that TPW exceeded its authority by promulgating a rule that failed to be consistent with the SFMP.[14] *See id.*

The legislature may delegate its power to administrative agencies established to carry out legislative purposes. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995). Administrative agencies only have those powers expressly or impliedly conferred by the legislature. *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 194 (Tex 1994). An agency can only adopt rules that are authorized by and consistent with its statutory authority. *Railroad Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). The determining factor in whether a particular administrative agency has exceeded its rulemaking authority is whether the rules are "in harmony" with the general objectives of the legislation involved." *Id.*; *Al Boenker Ins. Agency, Inc. v. Texas FAIR Plan Assoc.*, 2004 Tex. App. LEXIS 6827, at *10 (Tex. App.—Austin July 29, 2004, pet. denied).

---

[14] The Shrimpers appear to conflate their arguments about statutory authority and reasoned justification when, in their brief, they state that, by promulgating rules that were inconsistent with the SFMP, TPW acted arbitrarily and capriciously by ignoring a factor that the legislature intended it to consider and failed to offer a reasoned justification for its rules. The gist of the Shrimpers' argument is that the rules were not consistent with the SFMP as required by the parks & wildlife code section 77.007(f). They do not show that the legislature included the SFMP in the list of factors TPW must consider in promulgating a rule; these six factors are listed in the Parks and Wildlife Code section 77.007(b), which does not refer to the SFMP. Therefore, the rules' alleged inconsistency with the SFMP cannot show that TPW acted arbitrarily and capriciously in omitting a factor the legislature intended it to consider. *See Reliant Energy, Inc. v. Public Util. Comm'n of Tex.*, 62 S.W.3d 833, 841 (Tex. App.—Austin 2001, no pet.). Likewise, inconsistency with the SFMP has no bearing on whether TPW failed to offer a reasoned justification by omitting a summary of comments received, a discussion of the factual basis for the rule, or reasons it disagreed with certain comments. *See* Tex. Gov't Code Ann. §2001.035 (c) (West 2000); *Lower Laguna Madre Found. v. Texas Natural Res. Conservation Comm'n*, 4 S.W.3d 419, 426 (Tex. App.—Austin 1999, no pet.). Instead, the Shrimpers argue that, despite section 77.007(f), which prohibits rulemaking unless the rules are consistent with the SFMP, TPW made rules inconsistent with the SFMP and thus exceeded its grant of statutory authority.

16

Whether the rules are "in harmony" with the general objectives of the legislation involved is a question of law determined through statutory construction. *Id.* at \*7-10. We review matters of statutory construction *de novo*. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). In construing a statute, our objective is to determine and give effect to the legislature's intent. *Id.* If a statute's meaning is unambiguous, we look to the plain meaning of the statute. *State v. Gonzales*, 82 S.W.3d 322, 327 (Tex. 2002). The plain meaning of "consistent" is agreeing, compatible, and not contradictory. Webster's Third New International Dictionary 484 (1986). Thus, the rules are valid if they are compatible with and not contradictory to the SFMP.

The rules at issue are presumed valid and the Shrimpers bear the burden of showing that they are incompatible with the SFMP. *See Chrysler Motors Corp. v. Texas Motor Vehicle Comm'n*, 846 S.W.2d 139, 141 (Tex. App.—Austin 1993, no writ). Courts will uphold "legislative" administrative rules if they are reasonable. *Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 756 (Tex. 1982). The rules need not be, in the court's opinion, wise, desirable, or necessary. *Id*. We now inquire whether the rules are consistent with the SFMP.

In interpreting the SFMP, we treat it as an administrative rule construed in the same way as statutes, giving the agency interpretation of its own rule's requirements the deference it is entitled to receive from the courts unless it is plainly erroneous. *See Public Util. Comm'n v. Gulf States Utils. Co*., 809 S.W.2d 201, 207 (Tex. 1991); *Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310-12 (Tex. 1976); *Envoy Med. Sys., L.L.C. v. State*, 108 S.W.3d 333, 337 (Tex. App.—Austin 2003, no pet.). When there is vagueness, ambiguity, or room for policy determinations we defer to an agency's interpretation unless it is plainly inconsistent with the

17

language of the rule. *BFI Waste Sys. of N. Am. v. Martinez Envtl. Group*, 93 S.W.3d 570, 575 (Tex. App.—Austin 2002, pet. denied).

The SFMP recommends that closures and time restrictions continue to be based upon the life history of shrimp and defines shrimp nurseries based on the characteristics of the water environment and the life cycle of the shrimp. SFMP at 52; SFMP Source Document at 62. The Shrimpers contend that the rules did not take into account the character of the ecosystem or the life cycle of the shrimp. The Shrimpers first challenge the shortened season by pointing to provisions of the SFMP stating that area closures and time period restrictions should be the primary shrimp management tools, and that areas closed to shrimping should continue to be based on the life history of shrimp, especially as it relates to growth. SFMP at 52.

The Shrimpers misconstrue the SFMP by arguing that all restrictions on the length of shrimp seasons must be related to the life history of shrimp. The passage the Shrimpers rely upon recommends that closures of particular areas be based upon the life history of shrimp; it does not address limits on the shrimping season in general.[15] *See id*. However, TPW did justify the shortened season on numerous bases, which included the life history of shrimp. The rules as a whole are based on data showing overfishing and failure to achieve optimum yield, as required by the SFMP, and the regulatory measures chosen reflect the SFMP's recommendations; the primary management tools are time and area closures and gear requirements. 25 Tex. Reg. 10170. TPW noted that the shortened season would defer harvest of smaller shrimp, allowing them to be harvested later in their

---

[15] The SFMP's Management Strategies section, paragraph 5, recommends closing the season at certain times during the year instead of using bag limits as a management tool. Paragraph 6 recommends area closures continue to be based on the life history of shrimp, especially as it relates to growth. SFMP at 52.

18

life cycle, when they have had an opportunity to grow, mature and spawn. *Id*. at 10159. The continuing increase in the harvest of small shrimp is an ecologically unsustainable trend precisely because it interferes with the life cycles of shrimp. *See id*. at 10163. The seasonal closure would limit trawling and thereby reduce damage to the habitats that juvenile shrimp need during a portion of their life history; this allows juvenile shrimp to survive the fall open season and migrate over the winter months. *Id*. at 10159-61.

Citing the SFMP, the Shrimpers claim that nursery areas must be less than .9 meters deep and contain abundant detritus or vegetation, and that the rule expanding designated nurseries is inconsistent with the SFMP because it includes areas that are not really "nurseries." *See* SFMP Source Document at 7. Although the Shrimpers cite an SFMP reference to waters less than .9 meters deep in discussing the needs of postlarval shrimp, this is not even a purported definition of permissible designated nursery areas, and it does not purport to govern TPW's authority to make closures.[16] *See id*. What the SFMP does require regarding nursery designations is that areas closed to shrimping continue to be based on the life history of shrimp, especially as related to growth. SFMP at 52.

TPW expanded the designated nursery areas to prevent premature harvesting of juvenile shrimp. 25 Tex. Reg. 10167-68. TPW reasoned that "inshore closure or protection of juveniles seems to be more effective for allowing a stock to recover and for increasing spawning potential." *Id*. at 10158. Providing protection to shrimp in the new nursery areas would allow them

---

[16] "All three *Penaus* species utilize estuarine waters as nursery grounds. Postlarvae usually concentrate in water less than 0.9 m deep, where there is attached vegetation and/or abundant detritus. Shrimp stay in these areas 2-4 weeks before moving to deeper water." SFMP Source Document at 7.

to grow before being caught and increase the amount of shrimp available in open areas and the probability of escapement to the gulf to spawn. *Id*. at 10159. Consequently, we conclude that the nursery closures to protect juvenile shrimp are rationally based upon the life history of shrimp, especially as relates to growth, and are consistent with the SFMP regardless of whether the new nursery areas are .9 m deep or contain vegetation or detritus.

We hold that the rule amendments complied with section § 77.007(f) requiring consistency with the SFMP and that the Shrimpers have not shown them to be invalid. *See* Tex. Parks & Wild. Code Ann. § 77.007(f); *Chrysler Motors Corp.*, 846 S.W.2d at 141.

## CONCLUSION

Because TPW provided a reasoned justification for its rules and because the rules were not inconsistent with the SFMP, we hold that the district court properly granted summary judgment in favor of TPW. We affirm the district court's judgment.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed.

Filed:   January 27, 2005

20